Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6895 | **DATE** | 10/30/2000 |
| **CASE TITLE** | S.E.C. vs. HOMA, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Plaintiff's motion for a preliminary injunction freezing defendant, John M. Carlson's assets during the pendency of this cause of action is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | NOV 01 2000 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | ED-7 FILED FOR DOCKETING | | |
| | Copy to judge/magistrate judge. | 00 OCT 31 PM 3:19 | date mailed notice | |
| TBK | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Securities and Exchange Commission,

    Plaintiffs,

vs.

Charles Richard Homa, et. al.,

    Defendants.

No. 99 cv 6895
Judge Ronald A. Guzman

DOCKETED
NOV 0 1 2000

## MEMORANDUM OPINION AND ORDER

Pending is plaintiff's motion for a preliminary injunction freezing defendant, John M. Carlson's assets during the pendency of this cause of action.[1] For the reasons set forth below this motion is granted.

---

[1] On January 16, 2000 the court entered an interim order granting plaintiff's motion freezing defendant Carlson's assets in order to preserve the status quo and set the cause for a contested evidentiary hearing regarding the government's motion for a preliminary injunction. That hearing has now been concluded and the parties have filed supporting memoranda and arguments.

1

## BACKGROUND FACTS

The defendant, John Martin Carlson, is 55 years old and resides in Spring Grove, IL. He is the owner of Carlson National Brokers, Ltd. (CNB). CNB has been registered with the SEC as a broker dealer since February of 1992 and as an investment adviser since July of 1997. Carlson owns and controls Safe Harbor Returns, a Cayman Islands entity that received investor funds raised by the sale of bonds by Carlson and CNB purportedly on behalf of Cash For Titles. Carlson also created Tradewinds Holdings, LLC, a Nevada limited liability company of which he owns 30 percent. Tradewinds was created for the purpose of raising funds from investors for the Cash For Titles business. Carlson also created Peak Holdings, LLC, a Nevada limited liability company created for the purpose of raising money from investors by the sale of bonds for Cash For Titles. In addition Carlson created Harbor Holdings, LLC, a limited liability company, of which he owns 30 percent. Harbor Holdings was created for the purpose of soliciting investment funds for the Cash For Titles business. Between September 1998 and October 1999 John Telford Snipes, the person who brought Carlson this investment opportunity, and Carlson, through PRI and JTP (companies controlled by Snipes) raised at least $10.4 million from the sale of notes by PRI and JTP and the sale of bonds by Tradewinds, Peak and Harbor. Through Tradewinds, Peak, and Harbor Carlson raised at least $4.2 million from the sale of unregistered securities. In raising this money the defendant represented to investors that their funds would be loaned to a company that, in turn, loaned investor money to a company in the business of making car title loans or check cashing and advance loans. C4T Management, Inc. was identified as the recipient of the investors

funds, which funds it would receive for the purposes of making car title loans. But the funds were, in fact, not used as represented by Carlson to his investors. The vast majority of investor funds were instead sent to a bank in New York City which in turn wire transferred the funds to bank accounts in the Cayman Islands, or were used to make interest payments to investors and to pay commissions to Carlson and other investment brokers.

Carlson failed to properly conduct due diligence in that he obtained no independently audited, certified or verified financial statement of Cash For Titles' financial condition. He represented to investors that PRI had executed a $10 million security agreement for this offering. Although investors in the Tradewinds, Peak and Harbor offerings were told that their proceeds were invested in an unaffiliated capital company, in fact, the investor proceeds were loaned to Safe Harbor Returns, a Cayman company actually controlled by Carlson. He also represented to investors that the loans to the car title lending industry were secured by the vehicles pledged to obtain the car title loans. He knew that John Telford Snipes, the person who brought him this investment opportunity, had previously been sanctioned for his conduct in an investment scheme in which investors had lost much money. In fact, in 1992 Snipes was barred from acting as an investment adviser, broker-dealer or registered representative in the state of South Carolina until 1998. Snipes was not registered with the Securities and Exchange Commission as a broker or dealer. Furthermore Carlson knew, because he was told by Snipes, that the reason the investors' money was being sent to offshore accounts was for the purpose of avoiding SEC scrutiny. In handling the money through the limited liability companies established solely for that purpose and directing his investors' funds to the Cayman

Islands, Carlson was violating his own membership agreement with the NASD which required Carlson National Brokers to clear all transactions on a fully disclosed basis through its clearing firm. (Pl's Ex 11) In his affidavit and his testimony Mr. Carlson declared that he relied upon the representations of Mr. Snipes and of attorney Bland Burn whom Snipes introduced to him. Yet, he knew of Snipes' prior problems and had never met Mr. Burn. On the advice of these two individuals he proceeded, apparently without ever checking with his own counsel or the SEC, to form three separate holding companies for the purpose of directing investor funds to Cayman Islands accounts with the intent of avoiding SEC scrutiny.

Carlson explains that it was virtually impossible for him to find out that the money being invested was not making it to the Cash For Title loan stores and that therefore, the danger of misleading investors was unknown to him. Carlson maintains that he received reports from various individuals who visited the stores and verified that they existed and were operational. John Carlson independently verified the existence of some store locations and the fact that they were operational. He also testified that he invested thousands of dollars from his own IRA. According to his memorandum in opposition to the government's motion for a preliminary injunction he invested a total of $95,000, $60,000 of which came from his own IRA account between May and August of 1999. In addition, his mother invested $25,000 from her IRA, his son invested $10,000 and his former wife invested $40,000. His attorneys argue that this is hardly the conduct of someone who knows or has reason to be suspicious that the "Cash For Title" program is really a securities scam. Neither Carlson, who has been in the securities industry for fifteen years, nor his firm have ever previously been cited for any securities violations. Furthermore, they argue, it was virtually impossible for Carlson to find

4

out that the money being invested was not making it to the Cash For Titles loans stores. He was under the good faith belief that the money being invested was to be put into 100 existing stores in California, which were to be combined into check cashing and title payday loan stores. The money invested was deposited in a Bank of America account and then wired to Bank of Bermuda, thereafter the funds were wired to Preferred Returns' account in the Cayman Islands from which the money was to be forwarded to the Cash ForTitle loan stores.

One investor who testified stated that she was not told that her money, $100,000, would be sent to the Cayman Islands or anywhere outside United States. Although she did admit to being uncertain of some of the details of a conversation with Mr. Carlson, she was certain that she was not told this. In addition, she indicated that she had previously informed Mr. Carlson that she was very conservative in investing her money and she assumed, because of this and because of their prior business relationship, that this investment was a safe and conservative one as well. This witness also testified that she had previously been satisfied with Mr. Carlson's handling of investments. She stated, finally, that she was not sure as to whether or not she would ever invest her money through Carlson again.

## DISCUSSION

The question before us is whether or not under these facts the SEC has established a likelihood of succeeding on the merits of its claims against Carlson. We find, for purposes of this preliminary injunction hearing, that it has. There is contradictory evidence when it comes to establishing a specific intent to defraud. This evidence consists of two main points. First,

the Cash For Titles enterprise, unlike many fronts for fraudulent Ponzi schemes, was in fact an established business with many "stores" or outlets which actually engaged in the business of making loans to legitimate customers in exchange for high interest rates secured by the customers' automobile titles. Indeed, Cash For Titles was engaged in what appears to be a fast-growing commercial activity nationally. Thus, it is not inconceivable that, as Carlson claims, a legitimate securities dealer could believe the representation that the money was being raised to expand this substantial ongoing business. Further, there is evidence to support the fact that Carlson made some effort to verify that Cash For Titles was a legitimate business. Second, there is evidence that Carlson invested substantial amounts of his own money as well as his mother's money and even that of his brother in the Ponzi scheme. This tends to negate the assertion that Carlson was operating under actual knowledge that the entire scheme was a fraud.

On the other hand, for purposes of this preliminary injunction hearing, we find the evidence more than sufficient to establish a reasonable likelihood that the government will be able to establish at the very least recklessness or gross negligence, if not actual knowledge. This finding is supported by several facts. Carlson knew that Snipes had a questionable background, having been previously sanctioned and suspended in the state of South Carolina for inappropriate conduct in an investment scheme which resulted in the loss of much money for investors. Defendant argues that this does not constitute a "red flag" that should have alerted Carlson to the possibility of fraud. We disagree. Relying upon Snipes for advice and direction was so foolish as to suggest intentional avoidance. Snipes' background should have

6

put Carlson on notice as to the need to carefully investigate Snipes' representations before repeating them as fact to an unsuspecting public. Further, his purported reliance on an attorney presented to him by Snipes, and with whom he had personal contact, for advice as to such a large and complicated undertaking was also foolish to the point of being difficult to believe. Moreover, the evidence provides no reasonable excuse for his failure to conduct any independent investigation as to the existence of a legitimate business purpose for the elaborate scheme of collecting money and diverting it to offshore accounts. His failure to do so - especially in view of his testimony that in fifteen years in the securities business he had never been involved in anything like it - was at the very least reckless or grossly negligent; at worst such conduct leads to a reasonable inference of actual knowledge. Such a scheme, especially when proposed by one with a background in investment fraud, poses a very large "red flag". In his "Supplemental Declaration of John Martin Carlson" the defendant claims that "It was virtually impossible for me to find out that the money being invested was not making it to the cash for title loan stores." We disagree. Indeed, given the circumstances of which Carlson was aware, i.e., that the funds were being transferred to offshore bank accounts through limited liability companies which had no connection to the cash for title loan stores which were supposed to be the recipients of the investments, documentation that the investments were in fact reaching their announced destinations was absolutely necessary. Finally, of course, how a registered securities dealer could fail to consider himself forewarned of likely improprieties when he is told that the elaborate method for collecting and transferring investor funds to offshore accounts that he was invited to participate in was for the very purpose of avoiding unwanted SEC scrutiny, is impossible to understand. Such a statement alone to a registered

broker-dealer and investment adviser was enough to constitute a warning that there was danger here for the innocent investor. Carlson had to know that the very purpose for such SEC scrutiny is to guard against the type of fraudulent conduct he finds himself accused of today. Such a statement coming from a person who was previously barred from acting as an investment adviser, broker-dealer or registered representative due to improper practices which resulted in the loss of investor money is tantamount to a declaration of impropriety. For purposes of this hearing we find the evidence sufficient to establish a reasonable likelihood that the SEC will be successful in proving that Carlson's conduct, in its totality, amounts to, at the very least, recklessness and gross negligence under Sections 17(a)(2) and (3) of the Securities Act; at worst, the evidence is sufficient from which to reasonably infer actual knowledge of a scheme to divert investor funds away from the stated purpose of the investment to offshore bank accounts out of reach of the authorities for personal gain under Sections 17(a)(1), 10(b) and Rule 10b-5.

Thus, we find the evidence sufficient to support a freeze of Carlson's assets. Nor, do we limit the freeze solely to the net profit reaped by Carlson and his associates. The allegation in the complaint is that thousands of unsuspecting investors have lost millions of dollars as a direct result of the activities of Carlson and others upon whom they relied. Whether or to what extent Carlson managed to clear a profit from these activities can not be the measure of his responsibility. He is responsible, at the very least, for all of the investor money his alleged misrepresentations induced. Our paramount concern must be to secure for these innocent investors the maximum recovery of funds possible under the circumstances. Therefore, we

order as follows:

IT IS ORDERED that all funds and assets of defendants John Martin Carlson, Carlson National Brokers, Ltd., Tradewinds Holdings, LLC, Peak Holdings, LLC, Harbor Holdings, LLC (collectively, "Carlson Defendants") are hereby frozen and that the Carlson defendants and their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise are hereby restrained and enjoined from, directly or indirectly, transferring, selling, assigning, pledging, dissipating, concealing or otherwise disposing of, in any manner, any funds, assets, or other property belonging to, or in the possession, custody or control of, the Carlson Defendants, wherever located, and including any and all accounts in the name of any Carlson Defendants and any and all accounts in which any Carlson Defendant has signatory authority or a beneficial interest, except that Defendant Carlson may expend funds from his personal accounts, but only for reasonable and necessary living expenses. Defendant Carlson will promptly advise the commission of the accounts from which the living expenses are withdrawn. Defendant Carlson National Brokers, Ltd. may expend funds from its corporate accounts in the ordinary course of business and will promptly advise the commission from which accounts such expenditures are to be made and will provide a list of all such expenditures to the commission on a weekly basis; and

IT IS FURTHER ORDERED that the Carlson Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them

9

who receive actual notice of this Order, by personal service or otherwise and each of them, are hereby restrained and enjoined from directly or indirectly destroying, mutilating, concealing, altering or disposing of in any manner, any of the books, records, documents, correspondence, brochures, manuals, obligations, computer data or other property of or pertaining to the offer and sale of PE Trust, Peak and Harbor bonds, and Sunset Financial, T/P Funding and C4T financial and operating information, wherever located; and

IT IS FURTHER ORDERED that this Order shall be in effect pending further order of the court.

**SO ORDERED**

**ENTERED**: October 30, 2000

**HON. RONALD A. GUZMAN**
**United States Judge**