Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6895 | **DATE** | 11/7/2000 |
| **CASE TITLE** | SECURITIES & EXCHANGE COMMISSION vs. CHARLES RICHARD HOMA, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: The court finds the defendant, John Carlson, in contempt of court.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | | number of notices |
| | Notices mailed by judge's staff. | | NOV 13 2000 |
| | Notified counsel by telephone. | | date docketed |
| ✓ | Docketing to mail notices. | ED-7 FILED FOR DOCKETING | docketing deputy initials |
| | Mail AO 450 form. | 00 NOV -9 PM 5:42 | |
| | Copy to judge/magistrate judge. | | date mailed notice |
| CG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Securities and Exchange Commission, | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 99 c 6895 ) Judge Ronald A. Guzman ) |
| Charles Richard Homa, et. al., | ) ) ) |
| Defendants. | ) ) ) |

**DOCKETED**
NOV 1 3 2000

## MEMORANDUM OPINION AND ORDER

### Background

On June 6, 2000, this court entered an order in response to plaintiff's application freezing the assets of certain defendants newly added to this case. One of those defendants was John Martin Carlson. The order prohibited him from directly or indirectly transferring, selling, assigning, pledging, dissipating, concealing or otherwise disposing of in any manner, any funds assets or other property belonging to or in the procession, custody or control of the Carlson defendants (John Carlson, Carlson National Brokers, Ltd., Tradewinds Holding, LLC, Peak Holdings, LLC and Harbor Holdings, LLC). Thereafter, on August 14, 2000, defendant Carlson filed a motion entitled "Motion to Approve Sale of Frozen Assets with Proceeds of Sale to Remain Frozen." In this motion, Carlson admitted having sold a duplex unit located at 2036 41st Street SW, Naples, Florida, which belonged to him and was in his possession, custody and

1

428

control and asked the court to retroactively approve said sale and to order the proceeds of the sale to remain frozen. Subsequently, on September 7, 2000, this court issued an order for Carlson to show cause why he should not be held in civil contempt of court for the sale described in his own aforesaid motion. Mr. Carlson received this order and filed a response to the order to show cause which included a 28-page affidavit (Hearing Exhibit 1) and many other exhibits to explain and demonstrate in great detail how the sale of this property came about in direct contradiction of the court order and his lack of culpability for what had occurred. After the briefing by the parties, a contested evidentiary hearing was held. Subsequent to the evidentiary hearing, the parties filed further briefs. Thus, the question has been tried and briefed and is now ready for the court's ruling.

## Discussion

On June 6, 2000, the court announced in order freezing assets of John Carlson, Carlson National Brokers, Ltd., Tradewinds Holding, LLC, Peak Holdings, LLC and Harbor Holdings, LLC. The order was reduced to writing and entered on June 16, 2000. There is no dispute that Carlson was aware of the order and of the fact that under the order there could be no sale of the duplex that was ultimately sold without prior SEC and court approval. Carlson was aware of this by at least June 7, 2000 if not sooner. (Hearing transcript, Carlson direct, pp. 6-10, 29.) Nevertheless, after June 7, 2000, Carlson signed certain documents including an owner's affidavit, sale contract, and HUD settlement statements, all relating to the sale of the duplex. On July 23, 2000 and again on July 26, 2000, Carlson signed closing documents for the sale which occurred between July 21 and July 25 at which time he was aware that the order prohibited him

2

from selling the property. On or about July 24, profits for the sale were distributed to the three partners in the deal: Carlson, Terry Lurie, and Max Martinez. The profit shares of Lurie and Martinez were subsequently disbursed and, as of yet, have not been recovered. The sale proceeds which Carlson belatedly asks the court to freeze include only his share of the profits of the sale. The question before the court is whether or not Carlson's sale of the duplex at 2036 41st Street SW, Naples, Florida in contravention of the court's order constitutes a contempt of court.

To establish a contempt of court, plaintiff must prove by clear and convincing evidence that the opposing party violated such a court order. *See Goluba v. School Dist. of Ripon*, 45 F. 3d 1035, 1037 (7th Circuit 1995). This does not require the court to find that the violation was "willful," rather the court may find a party in civil contempt if that party has not been reasonably diligent and energetic in attempting to accomplish what was ordered. *Id.* Carlson makes no argument that the court's asset freeze order is either unlawful or insufficiently specific. Therefore, these arguments are waived.

In his own defense, Carlson testified that as early as June 2, 2000, he called his partner and attorney in the purchase of the properties, Terry Lurie, and told him of the asset freeze:

> Q. What do you recall discussing with Mr. Lurie on that date?
>
> A. I discussed with him that there was a -- that I had been named in a civil complaint -- and that I would be coming down on Sunday night -- and that my assets were going to be or were frozen. I had never had this occur before. So I was told that there was a pending freeze of the asset and he needed to be aware of that. And I wanted to see him before my 11:00 o'clock

(Hearing Transcript, Carlson-Direct, p. 8.)

According to Carlson, he also met with Lurie personally on June 5 in Florida and informed him of the asset freeze. On June 7 he met with his attorney, Mr. Tober, and witnessed a phone call from Tober to Lurie in which:[1]

> Mr. Tober explained to him the asset freeze,...
>
> A. Oh, absolutely. Yeah, he explained to him that there was a freeze on the assets and that there could not be any sale, that Mr. Tober made it quite clear to Mr. Lurie at that time that there was an asset freeze and there could not be a sale, as he made it clear to me.

(Hearing Transcript, Carlson-Direct, p. 9.)

In addition to their relationship as attorney-client and partners, Carlson and Lurie spent time together socially on many occasions. Carlson testified that on one such occasion on July 16 Lurie confided in him that he had sold his boat because he found himself in need of $30,000 to pay his divorce attorney and that he intended to use the proceeds from the sale of the duplex to replace it. According to Carlson he once again, at this point, warned Lurie that his assets were frozen and therefore the duplex could not be sold without court approval. Lurie acknowledged this. Lurie then told him that he anticipated a sale of the duplex at the end of the month.

---

[1] On cross-examination it was pointed out that the billing records submitted by Mr. Tober for his representation of Mr. Carlson do not reflect a charge for any such phone call on June 7. Further, in his brief, Exhibit 1, Carlson states that _he_ made the phone call from Tober's office.

4

Further, according to Carlson, in anticipation of the approval of the sale of the duplex, he agreed to sign sale documents so the property could be sold at the end of the month when he, Carlson, would be out of town. According to Carlson, his attorney, John Tober, advised him that he did not anticipate problems in getting approval of the sale because the SEC prefers liquid assets. On Sunday, July 23, he signed documents in blank for Lurie in anticipation of the sale. At that time Lurie told him that he anticipated closing "[m]aybe as late as Friday, possibly as early as Tuesday." (Hearing Transcript, Carlson-Direct, p. 14.) It was, according to Carlson, not until after signing the blank documents that he became concerned and so immediately thereafter, upon returning home, he called Mr. Tober and informed him of what he had done. He followed up the phone call with a fax. Further, he claims to have called Mr. Lurie and faxed him as well, although the fax is missing. In fact, there is no written record of either Carlson or Tober's instructions to Lurie not to sell the property without first obtaining their consent.

According to Carlson, the next he heard of the sale of the property was on Wednesday morning, July 26, when he received a phone call from Mr. Lurie and was surprised to hear that the sale was complete and he was to come and get his check. Both he and Mr. Tober subsequently protested to Lurie the sale without their permission. Later that afternoon, Carlson testified, he was interrupted in a meeting by a call from Lurie in which Lurie told him that he had talked to Tober, that he had fixed the problem, and he was sending over some documents for Carlson to sign. Because Lurie was in such a hurry and he, Carlson, was in the middle of a meeting, he signed the documents without looking at them, trusting that they were something Lurie and Tober had worked out, and faxed them back to Lurie. Carlson would have the court

5

believe that he signed these documents without first looking at them because he felt pressured by Lurie and he felt pressured to get back to his interrupted meeting. But this explanation, difficult as it is to believe on its face, becomes impossible to believe when he testifies just a few minutes later that "I actually called Mr. Tober and told him that I had just signed the documents that Mr. Lurie had faxed over . . . ." (Hearing Transcript, Carlson-Direct, p. 20.) Clearly, if he had both the time and the presence of mind to call Tober immediately after signing the documents, he could just as easily have called him immediately before signing. If he felt so rushed and pressured that he had not even the time to read the documents before signing, he would not have had time to call Tober immediately after the fact. Carlson's testimony is just not credible.

As difficult as it is to believe that given the circumstances he signed documents in the blank for Lurie before the closing, it is impossible to believe that he again signed documents blindly for Lurie after Lurie had allegedly so blatantly disregarded his repeated instructions not to sell the property in the first place. Nor, does it make any sense that Carlson, who as a mortgage loan officer for four years was familiar with closing documents, did not recognize that the second set of documents he signed at Lurie's request were part of the closing itself and not some magical fix to undo the sale that had just taken place. He claims to have signed the first set of documents on a Sunday because a few days later he would not be in town for the closing. Yet at that point in time his attorney had not even petitioned the court for permission to sell the property and he knew this. It makes no sense, given those circumstances, that Carlson would feel the need to sign or do anything to facilitate a closing that, according to what Lurie told him, would take place two days from then. On the contrary, any rational human being would simply

6

have concluded there was no need to sign such documents at that time given that permission for the sale had not yet even been obtained. Carlson knew at that time that he could not spend any assets without permission of the court according to the freeze order and that the order extended to the duplex. (Hearing Transcript, Carlson-Cross, p. 29.) He also knew that the closing was scheduled to take place, not anytime between Tuesday and Friday - as he testified, but on Tuesday - just two days later. We know this because the note he wrote to Tober on that same Sunday specifically said: "You need (I think) to contact the SEC and advise them that one of my investment properties I bought will be closing this Tuesday." (Exhibit 1, Tab 8.)[2] Clearly, when he left Lurie's trailer home on Sunday Carlson knew that the closing for which he had just signed documents was to take place in two days. This, in spite of the fact that he had been warned not to close the sale without the court's permission. Further, he knew he would be out of town when the closing took place and, therefore, in no position to assure that prior court approval was actually obtained. Nor did he make any arrangements by which Lurie could determine, prior to going forward with the scheduled closing, that court approval had actually been obtained. The emphasis obviously was on closing the sale with, at most, lip service being paid to the need for prior court approval.

---

[2]Actually we have before us three different versions of Carlson's state of knowledge regarding the date set for the closing of the 2036 41st Street SW property. His testimony during direct examination that Lurie told him that he anticipated closing "Maybe as late as Friday, possibly as early as Tuesday." (Hearing Transcript, Carlson-Direct, p. 14.) The note he claims he wrote to Tober in which he states unequivocally that the closing will be on Tuesday, *i.e.*, in two days. And finally, his response to the court's inquiry in which he stated that he had no knowledge other than that it would be toward the end of the month. (Hearing Transcript, Carlson -Cross, p. 72.) Carlson's testimony with regard to this, as well as other matters, was quite fluid.

Mr. Carlson's testimony also reveals that he seems to make a habit of calling his attorney immediately after committing the acts he claims to be seeking advice about. He notified Mr. Tober only after he signed closing documents at Lurie's house trailer. He could easily have called Tober before going to Lurie's house and inquired if it was wise to sign closing documents at that time. There was plenty of time to do so as his appointment with Lurie was no surprise and in fact, he had cancelled it once already. But he chose not to do so. Again he called Tober only <u>after</u> signing the second set of closing documents for Lurie on July 26. Given Lurie's alleged prior conduct, any reasonable human being seeking diligently to comply with the court's prohibition would have called Tober in order to verify Lurie's story before signing these documents. Any reasonable person diligently seeking to comply with the court's order would have taken the time to read any such documents before signing them. Finally, it appears that Carlson also, in spite of his initial denial, admits to having signed closing documents for a third parcel of real estate as well. Mr. Carlson, it seems, seeks to avoid all responsibility for his actions by mimicking the ostrich.

We also find it disturbing that, given all of the circumstances, neither Carlson nor Tober sent written escrow instructions to Lurie forbidding the sale of the property without Carlson's written authorization, nor a copy of the court's asset freeze order to place him on notice. Instead, just the opposite was done. Lurie was given, even if one believes Carlson, blank documents pre-signed by Carlson for a closing to take place in two days while Carlson was out of town. Such actions do not constitute a good faith diligent or energetic attempt to comply with the court's order. By engaging in such actions Carlson made the violation of the court's order against the

8

transfer of these properties inevitable.

Carlson's testimony is corroborated to some extent by the testimony of his attorney Mr. Tober. According to Tober in his first conversation with Lurie regarding the duplex properties on June 7, 2000, Lurie told him not only that there was no closing date, but that their were really no buyers whatsoever at that time. According to Tober his next conversation with Lurie was on July 26 after being informed by Carlson that the closing had actually taken place. Mr. Tober also explained that his billing statement did not reflect the June 7 phone call to Lurie because the statement simply contained ". . . only one entry for basically working entirely on all of Mr.Carlson's matters for that day." He also explained that it is impossible to enter every phone call and sometimes items are simply missed in the billing. (Hearing Transcript, Tober-Cross, p. 83.)

Unfortunately for Carlson, Tober's testimony also contradicts Carlson's testimony in some material respects. Tober denies having had any conversation with Lurie on Sunday, July 23, 2000. He further testifies that it was Carlson, not he, who had such a conversation with Lurie on that date. When asked to explained the discrepancy between his testimony and the content of Footnote 1 at page 3 of Exhibit 11, *Defendant John Carlson's Response to Order to Show Cause Why He Should Not Be Held in Contempt*, which clearly indicates that he, Tober, spoke to attorney Lurie on that Sunday, Tober replied that he had no explanation and reiterated that it was Carlson who had such a conversation, not him. Tober also contradicted Carlson's testimony that he, Tober, never informed him of the possible consequences of violating the court's asset freeze

order. In fact, Tober testified that he repeatedly discussed the subject matter with Carlson.

In yet another significant contradiction of Carlson's testimony Tober testified that when Carlson called him on Friday, July 21, he (Carlson) did not inform Tober that Lurie was preparing documents for an anticipated closing sometime soon. According to Tober on Friday, July 21, all that occurred was that Carlson once again asked ". . . what if those condos were to be sold, and I indicated to him with Court order, with Court approval and that only with Court approval, and that's -- it was a very simple conversation." (Hearing Transcript, Tober-Cross, p. 103.) In explaining why he failed to warn Lurie in writing not to close the sale of the duplex, Tober insists that he was never informed of any pending sale, much less an imminent closing date, at that time by Carlson. Carlson's testimony differs significantly. He testifies that he did in fact inform Tober that there was a potential pending sale. This is a crucial contradiction because any diligent good faith effort to comply with the court's order would necessarily have included: (1) informing his attorney of the fact that the closing was imminent and that on Sunday he would be signing the closing documents for Lurie and (2) asking whether or not it was possible, much less probable, to obtain court approval for the same by the projected closing date of the following week. It is significant in reviewing the testimony that at no time does Carlson indicate that he inquired of his attorney when court approval for such a sale could be expected. Without this crucial information it would be, at the very least, reckless to schedule or allow the scheduling of a closing. With this information he could simply have informed Lurie of an appropriate closing date. Good faith compliance with the court's order required at least this -- it is not a complicated or a heavy burden. Further, anyone with common sense, who was truly interested in complying

10

with the asset freeze order would have seen this immediately. Instead, Carlson proceeded in a manner which appears to be calculated to cause confusion and ultimately a violation of the court's order while seeming to be attempting to comply with the same.

Carlson's testimony is also contradicted in many ways by his other attorney, Terry Alan Lurie.[3] According to Lurie the closing on the duplex at 2036 41st Street SW, Naples, Florida was actually originally scheduled to take place on Thursday, July 20, 2000 at his office. Carlson was scheduled to come to his office and sign the seller's closing documents at 1:00 or 1:30 p.m. and the buyer, Omar Vargas, was scheduled to be in Lurie's office at 3:30 p.m. to sign the seller's documents. The scheduled closing did not take place because Mr. Carlson missed his appointment and the loan package from the lender did not arrive at his office in time. Further, on July 21, the buyer, Vargas, did sign his closing documents as scheduled. This would mean, if

---

[3] Mr. Lurie's credibility in the eyes of the court is damaged by several facts. First, is the existence of a 30 day order of suspension (June - July of 2000) issued by the Supreme Court of Florida pursuant to finding that he filed a false and misleading pleading involving legal controversies surrounding money owed by him to his former wife. Further, his testimony is in some respects amazing. Mr. Lurie appears to have duplicate "signed" documents for almost every document involved in the real estate transactions to which he testified. Often these documents differ in their content. Apparently new documents are prepared whenever Mr. Lurie feels it would be more convenient to have a different date or amount than what is reflected in the original document. Unused fully executed residential sales contracts are belatedly found attached to file folders apparently having been discarded for other executed but differing contracts for the same property. Similarly, HUD Settlement Statements are reformulated after closings have taken place and the originals have been submitted to the financial institutions for disbursement of funds. Documents are apparently routinely prepared and even notarized with false dates and in the absence of the purported signatories by both Mr. Lurie and his assistant. There is a distinct surreal flavor to the way Mr. Lurie practices real estate law. In addition, Mr. Lurie, has retained some of the proceeds of the sale of the property in question, even after he was made aware of the violation of the court's order. Such facts cannot help but impact his credibility as a witness.

11

true, that Carlson knew well before going to Lurie's house trailer on Sunday July 23 that the property was scheduled to close. Indeed, if true, this would make the entire chronology of events established by Carlson's testimony false. Carlson, of course, testified that he never really knew about a closing date for the property. Indeed, he testified that while he was signing the documents in blank at Lurie's home, Lurie was vague about a closing date. After he signed the documents, he testified that he panicked because Lurie then began to suggest that the closing could take place as early as the coming Tuesday or as late as Friday.

Lurie also denies that the documents Carlson signed were blank. In support of this contention Lurie testified that the computer program which he used to generate these documents does not have the capacity to print the documents in blank, but rather leads the user through a series of screens which require the information to be entered one screen that time and then prints out the completed document. He further points to the fact that the prorations for solid waste and county taxes on the HUD Settlement Statement form are done on the basis of a July 21 closing date. Lurie further testified that on July 26, the Wednesday after the Sunday on which Carlson signed the closing documents at his home, he drafted a new HUD Settlement Statement form which included entries showing the payment of commissions to Numero Uno Realty and Turner River Realty -- items not reflected on the original settlement statement. His reason for doing this was that he became nervous after his conversation with Carlson and Tober on July 26 and realized that he had no written verification of what he and Martinez were entitled to under the terms of the oral partnership agreement between them and Carlson. Following his conversation on July 26, he became concerned that he would not receive his commission and, in order to

12

ensure this he included the commission amounts in the settlement statement and had them re-executed. These are part of the second set of documents that Carlson signed allegedly without reading on July 26. Lurie admits that had he not done this he would not have received his share of the profit from the transaction because all of the sale proceeds would, according to the original HUD Settlement Statement have gone to Carlson first and he, Carlson, would then have had to distribute the appropriate amounts to Lurie and Martinez. The funds, however, would likely have been frozen while in Carlson's possession. Lurie also flatly contradicts Carlson's testimony as to what Carlson told him regarding the court order on Sunday, July 23:

> Q. I want to go back to July 23rd for a minute. Mr. Carlson came to your home to sign the closing documents. What did Mr. Carlson say to you, if anything, about the SEC case or an asset freeze?
>
> A. He mentioned that his attorney had conversations with the SEC and that he saw no problem with the SEC taking the sale proceeds and not the property. And then I proceeded to ask him did he want me to make the check out to his attorney and send the check to his attorney or did he want me to make the check out to him. He advised me no, we can make the check out to him.
>
> Q. To whom?
>
> A. To Mr. Carlson.
>
> Q. Did Mr. Carlson say anything else about any escrow instructions on July 23rd?
>
> A. Absolutely not.
>
> Q. Did Mr. Carlson say anything about not selling the property when he signed the documents on July 23rd?
>
> A. He did not.

13

(Hearing Transcript, Lurie-Direct, pp. 127-28.) According to Lurie, Carlson never to asked him to delay the closing in order to get court approval.

Lurie also denies ever having told Carlson that he intended to use his share of the profits from the sale of the 2036 41st Street SW property to buy a new boat to use in his charter boat business, or that he sold his boat to pay for the legal fees he owed relating to his divorce.

Lurie's testimony also directly contradicts Tober's in several respects. According to Lurie the very first time he ever spoke to John Tober was on July 26. Tober, of course, places his first conversation with Lurie regarding the duplex properties on June 7, 2000, when he was told not only that there was no closing date, but that there were no buyers to the property whatsoever. Lurie claims total surprise and shock when, during the July 26 conversation, Tober berated him for proceeding with the closing.[4]

---

[4] Carlson has filed a *Motion to Supplement Record Contemporaneous with Filing Written Argument* to which he has attached an affidavit which references what purports to be a Nextel itemized phone record of Carlson Financial Consultants which shows a phone call on 6/7/00 to a Naples Florida number of 941- 435-1526 (or 1626 - the photocopy is almost illegible) as proof of the fact that the phone call to Lurie on June 7 did take place. Apart from the propriety of supplementing an evidentiary hearing with affidavits and documents which the other side has no chance to rebut or even cross examine, we note the following about this submission: First, the court has no idea who this phone number belongs to. Second, there appears to be yet a second call on that same date, at line 246, to the same number less than two hours later. Nobody testified that there were two phone calls to Lurie on that same date. Third, the most that such a document can prove is that a number was called. It does not prove who was spoken to and, critically, it cannot confirm whether or not the subject of the court's freeze order was discussed. Finally, we are confused as to why such a phone call would be on Mr. Carlson's phone bill. According to the testimony by Carlson himself the phone call was made by Mr. Tober from Tober's office and it was Tober who spoke to Lurie. Why would Tober use Carlson's mobile phone thereby placing a business call involving sensitive matters over an insecure mobile phone link from his own office

14

As can be seen from our review of the evidence the testimony is in substantial contradiction. Indeed, it seems likely that all of the witnesses were either significantly mistaken or not entirely truthful as to some aspect or other of their testimony. However, in spite of this confusion the record does lead to some clear conclusions. John Carlson's actions have been proven by clear and convincing evidence to be in contempt of court. Indeed, his own testimony is probably sufficient to establish that. When combined with the testimony of his own attorney which contradicts him in some crucial respects, the conclusion is unavoidable. He has failed utterly in his duty to be reasonably diligent and energetic in attempting to comply with the court's order. Furthermore, his actions have been so in contradiction to his responsibilities under the order that we can only conclude that his failure was intentional. While paying "lip service" to the court's order he consistently undercut the order by his actions and made it, not only possible, but almost certain that the property at 2036 41st Street SW, Naples, Florida would be sold in spite of the court's clear and unambiguous order to the contrary. The court finds the defendant, John Carlson, in contempt of court.

## Sanctions

We must now address ourselves to the appropriate sanction. To the extent possible Carlson must be made to right the wrong he has committed. As a direct result of Carlson's actions at least $20,351.98 has been lost from the value of the duplex which he transferred in violation of the court's order. The defendant, John Carlson, is hereby ordered to pay into the

---

where he, presumably, has a much more secure, reliable and cheaper alternative?)

15

escrow account controlled by the receiver which holds the net proceeds of the sale of the property the sum of $20,351.98 from current and future earnings that are not already subject to the court's freeze order at the rate of one thousand ($1,000.00) dollars per month commencing with the month of November 2000. Furthermore, plaintiff, the SEC, is ordered to file with the court an accounting of the actual expenses and hours expended in the preparation, investigation, and prosecution of the Rule to Show Cause. The court will then determine an amount payable by the defendant, John Carlson, to reimburse the agency's expenditure of taxpayer money which would have been totally unnecessary absent the defendant's contumacy.

**SO ORDERED**         **ENTERED**: November 7, 2000

*[Signature]*
**HON. RONALD A. GUZMAN**
**United States Judge**