# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6895 | **DATE** | 5/12/2004 |
| **CASE TITLE** | SEC vs. CHARLES RICHARD HOMA, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: The receiver's petition to find Paine Webber in civil contempt is GRANTED.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| X | Notified counsel by telephone. | | MAY 13 2004 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 13163 |
| | Copy to judge/magistrate judge. | | | |
| CG courtroom deputy's initials | | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | 99 C 6895 |
| v. | ) ) | Judge Ronald A. Guzmán |
| CHARLES RICHARD HOMA, et al., | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

From at least 1995 through October 1999, until he was arrested by the FBI, prosecuted criminally by the United States Attorney's Office, and civilly sued by the Securities and Exchange Commission ("SEC"), Charles Richard Homa ("Homa"), with the assistance of Michael E. Gause ("Gause"), developed and operated one of the largest Ponzi schemes in United States history, using a variety of businesses supposedly associated with an automobile title lending business called "Cash 4 Titles" or "C4T." In total, the principal sum lost by innocent investors ("Investors") exceeded $165,000,000.

On November 2, 1999, Mr. Phil Stenger was appointed receiver of the assets of Homa, Sunset Financial Services, LLC, C4T Management, Inc., TIP Funding Services, Inc. and the affiliated entities of the foregoing (the "Receivership Property") including the interests of any
DOCKETED
MAY 13 2004

individuals or entities constituting Receivership Property in Banc Caribe or accounts therein. The Receiver's general mandate is to marshal C4T related assets for the benefit of investors.

The SEC Action was filed on October 15, 1999, and was originally filed in the Federal District Court, Southern District of New York. The assigned judge, the Honorable David N. Edelstein, entered the *"Order Preserving Funds and Other Assets and Identifying Assets"* which froze the assets of the Defendants and ordered, in relevant part, that "Defendants ... preserve all funds and other assets and Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants, including but not limited to GMD Aviation, Inc. and Banc Caribe, Ltd., who received actual notice of the Order, by personal service or otherwise, are prohibited, directly or indirectly, in transferring, selling, assigning, encumbering, pledging, dissipating, concealing or otherwise disposing of in any manner, any funds, assets, or other property belonging to, or in the possession, custody or control of the Defendants, wherever located."("Freeze Order").

On October 15, 1999, Amy Cotter, an attorney at the SEC, sent via facsimile a copy of the Freeze Order to Sonia Bonaventure at PaineWebber, Inc., and requested that PaineWebber search its records to determine if it held any assets that were covered by the Freeze Order. Subsequently, Jones directed that PaineWebber wire transfer $1,975,000 out of the Banc Caribe PaineWebber account to an account established by Pollock and/or Jones in the name of Banc Caribe at Alpha Credit Bank in Athens, Greece. Before this Court is the SEC's motion for PaineWebber to show cause why it should not be held in contempt of court for aiding Banc Caribe in transferring $1,975,000 out of the Banc Caribe PaineWebber account to the Banc Caribe account at the Alpha Credit Bank in Athens, Greece

2

in violation of the Court's freeze order. On September 22, 2003, an evidentiary hearing was held to determine if PaineWebber should be held in civil contempt for failing to honor the Freeze Order; and why it should not, as a remedy, be ordered to pay the Receiver $1,975,000 that he would otherwise have access to had the Banc Caribe account been frozen by PaineWebber as ordered.

At the hearing, Scott James Hlavacek testified that he is the Assistant Regional Director for the Securities and Exchange Commission in Chicago. Mr. Hlavacek has an undergraduate degree in history and a masters in business administration with a concentration in finance. He is also a certified public accountant. It was his responsibility to trace funds that were raised by the C4T Ponzi scheme. The C4T scheme was one of the largest ever investigated by the SEC with an estimated $300 million raised from investors. (Hearing at 7.) Based upon the belief that Sunset Financial Services, an organization linked to Defendant Homa, had placed funds with PaineWebber, Hlavacek, in July 1999, sent a subpoena to PaineWebber. The subpoena was directed to PaineWebber's legal department or compliance department. In late July a response was received from Ms. Sonia Bonaventure, a paralegal, in the form of a letter. The response included account statements for one account in the name of Bank Caribe at PaineWebber. The Banc Caribe account was closed. Banc Caribe was known to the SEC investigators as an off shore bank created by defendant Homa to launder Cash 4 Titles funds in the island of Dominica.

On August 31, 1999 Hlavacek learned that one of the Cash 4 Titles entities, J.B. Roof and R. Ellenberg LLC, deposited $5.3 million of investors' funds in a Banc Caribe account for credit to T/P Funding at Dain Rauscher. (*Id.* at 11.) Dain Rauscher informed Hlavacek that $2 million of that money was transferred to an account in the name of Banc Caribe for credit to T/P Funding at

PaineWebber. In response to this information Hlavacek called Sonia Bonaventure, and "inquired about the status of those funds at PaineWebber." He told Bonaventure that they were trying to trace the funds as part of their investigation. (*Id.* at 12, 17-18.) He followed up with a fax to Bonaventure containing a copy of the wire transmittal sheet/fax he received from Dain Rauscher which reflected the transfer of the $2 million from Dain Rauscher to PaineWebber.[1] Because the response from PaineWebber did not address the particular account or the $2 million, Hlavacek called Bonaventure to inquire about it sometime in late September or early October. According to Hlavacek, Bonaventure declared that the money was not at PaineWebber and she could not determine what had happened to it. (Id at 16-18.)

On October 15, 1999 the Cash 4 Titles case was filed, and Hlavacek faxed a copy of the asset freeze order to Bonaventure (Ex. H), called to confirm receipt, and inquired again about the $2

---

[1] Hlavacek identified page 3 of Exhibit F as the wire transmittal sheet/fax which he received from Dain Rauscher and which Dain Rauscher identified as the direction from Banc Caribe to transfer $2 million to the Banc Caribe PaineWebber account. On that document, the account number for PaineWebber's Banc Caribe account is listed as GO4986C-TG. Hlavacek also indicated that in his phone conversation with Bonaventure he said to her: "I said that we were interested in finding out where these funds went. We believe they went into this account, GO4986C-TG, in the name of Banc Caribe, Ltd." (Hearing at 14.) Hlavacek also testified that there is no independent indication in his file that this particular document, page 3 of Exhibit F the wire transmittal sheet/fax, was actually sent to Bonaventure, although there is a transaction report from his fax machine indicating that he did send a nine-page fax to PaineWebber on September 1 at 11:00. Because the transaction report refers to a nine-page fax and Exhibit F as it exists in his file is nine pages attached, he assumes that those were the nine pages that were faxed. On cross-examination this testimony was challenged. Hlavacek admitted that the pages of Exhibit F were not even stapled together when he went back to the file to produce it in response to PaineWebber's request. They were, however, paper clipped together. Paine Webber's counsel also pointed out that at his deposition Hlavacek's testimony as to what was said during this particular initial conversation that occurred on August 31" or September 1" did not specifically include the details that would have informed Bonaventure that he was referring to the $2 million related to Banc Caribe or account GO4986C. PaineWebber's counsel also pointed out that the paper clipped documents forming Exhibit F only total 9 pages because a page in sequence is missing. If the missing page is added, then the total number of pages would be 10 - one more than the number of pages actually sent by Hlavacek according to his own fax verification. Or, of course, if that missing page is added and the wire transmittal sheet/fax is subtracted from the exhibit, then the total number of pages would be nine - the exact number of pages Hlavacek's fax confirmation indicates were actually sent. Faced with these circumstances, Hlavacek testified that he still believes his September 1, 1999 fax to PaineWebber contained the August 25, 1999 wire instruction, page 3 of Exhibit F, but he cannot be 100 percent sure.

4

million at the PaineWebber account. His phone call was for the purpose of making sure that this order served to freeze the $2 million which he knew at that point had at least gone through PaineWebber and believed might still be there. Bonaventure's response was that they did not have any of the funds and that there were no accounts of Banc Caribe at PaineWebber at that time. (Hearing. at 19.) Hlavacek believes that he told Bonaventure that the $2 million were subject to the freeze order. He also believes, but cannot be sure, that he mentioned that Mr. Homa, one of the defendants, was the chairman of Banc Caribe. He is certain he told her that those funds had been traced from the Ponzi scheme to the particular account at PaineWebber and that was why the freeze order was being served on PaineWebber. (*Id.* at 58.) After the direct, cross and redirect examinations the Court asked the following question of Hlavacek: "Okay. At any time did you impart any information to her to connect those funds with the defendants in this case?" His answer:

> I may have done it in that conversation or the prior conversation, where I explained how the money had flown from the investigation that we were tracing those funds from this investigation from Dain Rauscher to PaineWebber and that they were funds of.... That we were tracing them as part of our investigation into this -- if I did it in September, I wouldn't have said Ponzi scheme because we hadn't filed the case yet. But as part of our investigation, and that these were funds that we wanted to determine where they went because they were part of our investigation. If it was on the 15th, I would have said that they were part of this Ponzi scheme that we were -- had filed a case on. I know that I told her it was a $300 million Ponzi scheme that we had filed on the 15th -- or on the -- yeah, on the 15th, and that these were funds that were traced from that Ponzi scheme. I can't be sure if whether I said on the 15th that they were part of the Ponzi scheme and came from that or whether I told her earlier that they were funds that we were tracing as part of our investigation into this matter."

(*Id.* at 63-64.) This is Hlavacek's clearest statement on what information he actually stated to

5

PaineWebber regarding the connection between the $2 million he believed PaineWebber was holding and the freeze order in this case. Unfortunately Mr. Hlavacek was not always this clear. For example, when asked on direct examination whether or not in his late September or early October phone conversation with Bonaventure he in any way linked the $2 million dollars to the investigation he was performing he answers: "Just that it was funds we were trying to trace as part of our investigation." (*Id* at 17-18.) On cross examination he was asked directly if he had ever told Bonaventure that any defendant in the Homa case owned or controlled any funds in the Banc Caribe account at PaineWebber, he answers: "I believe I told her that we believed that those funds were subject to the freeze. I don't know if I read the language as you just did from the freeze." (*Id.* at 58.) When asked if he ever told Bonaventure that Banc Caribe was controlled by the defendants he responds: "I think I did at the -- on the 15th. I may have alluded to Mr. Homa being the chairman and that he was one of the owners. I can't be sure whether I said that or not.... I know that I told her that we had traced the funds from the scheme to that account at PaineWebber and that was why I was serving the freeze order on them." (*Id.*)

In January 2000, John Miron from PaineWebber called and indicated that Bonaventure was no longer employed there and that he was now working on the file and would like to close it out. In response to Hlavacek's inquiry Miron searched under the same account number and found that under a slightly different number, Banc Caribe did in fact have an account at PaineWebber at the time of the asset freeze and that the funds, $1,975,000, left PaineWebber on October 20th and were transferred to a bank in Athens, Greece.[2] In response to a subsequent letter from Hlavacek

---

[2] The account number given to Bonaventure and Miron by Hlavacek was GO4986C-TG. The correct account number was 49869-TG. The only difference was that the letter "C" was actually a number "9". (*Id.* at 22-24.)

6

PaineWebber's general counsel, Herbert Janick, promised that an investigation would be done and they would get to the bottom of what had happened and why.

Pursuant to the October 15, 1999 freeze order, Dain Rauscher and another Bank, South Trust Bank, froze whatever assets of Banc Caribe they had at the time in their accounts. Dain Rauscher eventually transferred approximately $3.4 million through the receiver. South Trust Bank transferred approximately $200,000 to the receiver and subsequently Dain Rauscher transferred another approximately $400,000 that were the proceeds of a bond it held under the name of Banc Caribe. Later, in July, the receiver was successful in freezing $4.7 million in a Bank America account. That money is still not in the receiver's possession.

Sonia Bonaventure testified on behalf of PaineWebber. Ms. Bonaventure holds a bachelor of science degree from St. Francis College. She was employed by PaineWebber during the time in question as a paralegal. As such, her responsibility was to respond to subpoenas. She testified she had no responsibility, experience, or training in responding to an asset freeze order. She denied that anybody had ever told her that PaineWebber might have accounts that were subject to a freeze order or that funds from a fraud had been traced to PaineWebber and should be frozen. She denied that the handwriting on the freeze order copy, Exhibit 9, is hers, and she does not recall ever having received a copy of that document. Had she received such a document, she testified she would have turned it over to her supervisor Dan Roberts because she does not have anything to do with freezing accounts. In all the time she was at PaineWebber she never discussed with anybody from the outside that funds traced to PaineWebber should be frozen because they were the fruits of a fraud or anything like that. She has never worked with freeze orders. (*Id.* at 97.)

From the subpoena file (Ex. 27), which PaineWebber mysteriously re-discovered just a few days before the commencement of this evidentiary hearing, Bonaventure identifies two documents, designated pp. 27-51 and 27-52, which establish the existence of an account at PaineWebber numbered GO 49869 in the name of BancCaribe with a balance of $2 million as of August 30, 1999. She indicates that these two documents were generated on August 31, 1999 and that they could have been generated only by putting in the proper account number, but the account number could have been found by using the account name. (Hearing at 101.) In other words, if anyone had searched for accounts under Banc Caribe they would have come up with the correct account number and could then have used that number to generate these two pages. In spite of the fact that the subpoena file contains an account statement for Banc Caribe Account GO 49869, and that Hlavacek testified he inquired about a Banc Caribe account number GO 4986C, Bonaventure states that she has no recollection of ever discussing either account or account number with any SEC representative. She indicates, however, that if she had found the information reflected in the account sheets for those account numbers, she would have supplied that information to the SEC had they requested it. Bonaventure can conceive of no reason for her to have looked up, printed to paper, and filed the computer screen for Account GO 49869 other than for the purpose of fulfilling her obligations under the subpoena assigned to her by her supervisor. Someone, she states, must have asked her about that account. (*Id.* at 116.) She testified that it is possible that someone asked her apart from the request in the subpoena. In response to a series of questions from the Court, Bonaventure affirms that the subpoena in the subpoena file which she kept named Banc Caribe. In order to comply with this request she would run a search for the name "Banc Caribe." If she had done that she would have come up with the computer screen for the GO 49869 account of Banc Caribe showing a $2 million balance. And if she had come up with such a document she would have forwarded it to the SEC as

8

part of the response to the subpoena. She concludes that if she had followed her usual procedures she would, in fact, have sent the Account GO 49869 document showing the $2 million dollar balance for Banc Caribe at PaineWebber to the SEC. She concludes, however, that she did not send this information, because if she had she would expect to also see in the file the actual documents from the account, not just this printout of a single computer screen. Finally, Bonaventure indicates that she would have looked up these account documents only if necessary to respond to a subpoena assigned to her by her supervisor or if someone else had asked her about that account. Although the GO 49869 account was not opened until August 20, 1999, after her initial response to the subpoena, it was discovered by PaineWebber on August 31, 1999, well before the freeze order - but about the time that Hlavacek testified he inquired of PaineWebber both by fax and phone conversation of the existence of such an account. From this set of circumstances and occurrences we find it is clear that someone at PaineWebber, probably Bonaventure, did receive Hlavacek's request for the information about the $2 million dollar Banc Caribe account, found the account and printed out pp. 27-51 and 27-52 of Exhibit 27. The documents and information were never sent to Hlavacek during the investigatory phase of the case and subsequently, after the complaint was filed, the account reflected in these documents was never frozen by PaineWebber even though PaineWebber was aware that the SEC considered the information regarding the account as part of its investigation of the whereabouts of the proceeds of the Cash 4 Titles Ponzi scheme and even though the freeze order subsequently issued named Banc Caribe as one of the agents of the defendants that was specifically barred from transferring any of the defendant's assets. PaineWebber's failure to freeze the $2 million account under these circumstances is at the very least reckless. Had PaineWebber either communicated the existence of this account to Hlavacek or frozen the account upon receipt of the court's order, the $2 million with still be available for the reimbursement of the thousands of innocent investors who were

duped by this scheme.

PaineWebber's counsel argues that evidence establishes that on August 31, 1999, Hlavacek had a conversation with Bonaventure in which he gave her an account number, to wit GO4986C, which was incorrect. Bonaventure "looked up that number" and told him there was no such account. At the same time, she found account number 49869 which also had $2 million in the account and told Hlavacek about it. Hlavacek told her he would get back to her, but "it's undisputed that he never got back to her about information from Dain Rauscher or any further clarification about the number. And that was the last time that Ms. Bonaventure was ever asked to address or focus on that account." (Hearing at 76.) We cannot accept this amazing argument. To find this argument convincing, we would have to conclude that Hlavacek, after hearing that PaineWebber did in fact have a Banc Caribe account with the precise amount of money as the Cash 4 Titles funds he was looking for, and with the exact same account number except for one digit, either determined that this could not possibly be the funds he was tracing from Dain Rauscher or simply neglected to follow up by asking for the 49869 account statements. This would be an astonishing failure for an MBA/CPA Securities and Exchange Commission investigator who had been intensely tracing these very funds for some time. Not to mention that both Hlavacek and a Bonaventure deny any recollection of such an event. Further, Hlavacek testified that he inquired as to this 4986C account several times thereafter, although this is contradicted by Bonaventure. But it is uncontradicted that before consenting to Miron's request to close the subpoena inquiry, Hlavacek once again asked for a tracing of the $2 million which he was informed had been transferred from a Dain Rauscher Banc Caribe account to a PaineWebber Banc Caribe account. Why he would still be making such a request months later and yet not have requested an accounting and tracing of the $2 million in the Banc Caribe 49869 account

10

when he first heard of it, PaineWebber does not explain. We must keep in mind that the SEC investigation had already established, and therefore Hlavacek already knew, that Banc Caribe was an off shore Bank created by defendant Homa to launder Cash 4 Titles funds in the island of Dominica. How could Hlavacek have failed to follow up when informed that this entity established by Homa to launder Cash 4 Titles funds had $2 million sitting in a PaineWebber account whose account number was almost identical to the number Dain Rauscher had given him as the transferee of $2 million in Cash 4 Titles funds? There is absolutely no other credible evidence in the record to support such a conclusion. On the contrary it is clear from the record that Hlavacek was extremely interested in recovering these funds and was frustrated that they seem to have disappeared upon reaching PaineWebber. Moreover, it also is undisputed that when Hlavacek finally found out from Miron that a Banc Caribe account 49869 existed and that $2 million in it had been transferred to Athens, Greece, he was so upset that he wrote to PaineWebber's general counsel demanding an explanation. Yet, we are asked to believe that months earlier when told that such an account existed at PaineWebber, he did nothing whatsoever to freeze the account. There are significant inherent inconsistencies in PaineWebber's interpretation of the evidence. Why PaineWebber never informed Hlavacek of the existence of this account we do not know, but the only logical reasonable conclusion from the documentary and testimonial evidence is that Hlavacek was _not_ informed even though it is clear that PaineWebber knew of the existence of the account in the name of Banc Caribe and that the account contained $2 million.

From these exhibits and testimony we conclude that the receiver has established by clear and convincing evidence:[3]

---

[3] To establish a civil contempt the complaining party must prove that the order was violated by "clear and convincing" evidence. *Stotler and Co. v. Able,* 870 F.2d 1158, 1163 (7th Cir. 1989).

11

1.) The subpoena duces tecum issued by the Securities and Exchange Commission to PaineWebber on July 22, 1999, indicates that the subpoena relates to *"In the Matter of Certain Internet Offerings* (HO-3500), an investigation pursuant to a formal order issued by the Securities and Exchange Commission under the authority of Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934."

2.) Under documents to be produced, the subpoena describes:

> [T]he following documents relating to all accounts in the name of or for the benefit of; Sunset Financial Services LLC, Atlanta Jet Properties LLC, C4T Inc., C4T Funding, Inc. C4T Management Inc., Custom Compounding Centers Inc., GMD Aviation Inc., Florida Construction and Development Inc., Florida Development Fund 1995, Silver Line Development Corp., S & R Financial Inc., **Banc Caribe,** and Adams Stephens Inc. including but not limited to account # FH2345118.

( Ex. B) (emphasis added).From this it is clear that PaineWebber had been informed that Banc Caribe was a suspect in the Ponzi scheme investigation.

3.) That the defendants and any of their agents who have actual notice of the order are prohibited from transferring or otherwise disposing of in any manner the funds, assets, or other property belonging to or in the possession, custody or control of the defendants. Therefore, Banc Caribe was barred by the order from transferring any assets being held for the benefit of any defendant.

4.) Having received the freeze order, PaineWebber was on notice that Banc Caribe was forbidden to transfer the funds of any defendant, including T/P Funding Services, Inc. and that

12

therefore, PaineWebber was prohibited from aiding Banc Caribe's transfer of any such funds. Although PaineWebber was not specifically named in the order, the order clearly required a specific course of action from it and all others with notice of its prohibition.

5.) The PaineWebber account number GO 49869 in the name of Banc Caribe with a balance of $2 million existed as of at least August 8, 1999. PaineWebber was aware that the SEC was attempting to find and trace the money in this account as money representing proceeds of the Ponzi scheme it was investigating. We find that the information regarding the existence of this account was never given to the SEC and that after being served with the Court's freeze order, PaineWebber aided Banc Caribe in transferring these funds to an account in Athens, Greece.

The state of mind of a party to the underlying action is irrelevant in a civil contempt proceeding. An inadvertent violation does not preclude a contempt citation. *Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 785 n. 11 (7th Cir.1981). While in a criminal contempt proceeding the minimum requisite intent may be defined as a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful, (*United States v. Seale*, 461 F.2d 345, 368 (7th Cir. 1972), in civil contempt proceedings the issue is not the employer's state of mind but simply whether the Court's order was in fact violated. *NLRB v. Crown Laundry & Dry Cleaners*, 437 F.2d 290, 293 (5th Cir. 1971). "[S]ince the purpose [of civil contempt] is remedial, it matters not with what intent the defendant did the prohibited act.... An act does not cease to be a violation of the law and of a decree merely because it may have been done innocently." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). A party in a civil contempt action is required to at least make a good faith effort to comply with the district court's order. The district court may find a defendant in civil contempt if he has not been "reasonably diligent and energetic in attempting to

13

accomplish what was ordered." *American Fletcher Mortgage Company, Inc. v. Bass*, 688 F2d 513, 517 (7th Cir 1982) citing *Powell v. Ward*, 643 F.2d 924, 931 (2nd Cir. 1981).

Thus, it is clear that if PaineWebber were a party to this case, it would be liable for civil contempt. It clearly has not been either reasonable or diligent in attempting to comply with the order. The reasonably diligent thing to do, given that the order named Banc Caribe as an agent of the named parties and that PaineWebber knew the SEC considered the $2 million in the Banc Caribe account to be money derived from the Ponzi scheme, would have been to freeze the assets and notify the appropriate parties so that, if necessary, resort could be had to the SEC or to the courts for a final determination as to the status of those funds. However, the case against PaineWebber is that of an aider and abettor - an agent who has aided the target of the freeze order in its violation of the same. PaineWebber is not a party or target of the freeze order. As to non-parties the Seventh Circuit has held that:

> [U]nder certain circumstances Rules 70 and 71 of the Federal Rules of Civil Procedure permit a district court to find a nonparty in contempt. Rule 70 permits a court to find a party in contempt if he fails to honor a court's order. Rule 71 provides that "when obedience to an order may be lawfully enforced against a person who is not a party, that person is liable to the same process for enforcing obedience to the order as if a party." However, Rule 71 does not define the circumstances under which an order "may be lawfully enforced," instead leaving that issue to the enforcing court. 12 C. Wright & A. Miller, *Federal Practice and Procedure* § 3031 (1973)...We also agree ... that ordinarily a court may find a nonparty in contempt if that person has "actual knowledge" of the court order and "either abets the [party named in the court order] or is legally identified with him."

*Stotler and Co. v. Able*, 870 F.2d at 1164. See also *Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 61 F.3d 94, 98 (1st Cir.1995); *Goya Foods, Inc., v. Wallack Management Co.* 290 F.3d 63,

14

75 (1stCir. 2002). As to PaineWebber, then, the record must first establish that it had actual knowledge of the court order. The record is clear that it did. Hlavacek testified that he called PaineWebber in order to assure that it had received the freeze order and to inquire about the $2 million dollars. Further, on October 15,1999 Hlavacek sent a facsimile cover sheet to Bonaventure with a copy of the freeze order entered the same day. The cover sheet contained the following message: "Asset freeze on the accounts of Banc Caribe Limited." (Ex. H.) Nor does there appear to be any assertion that PaineWebber is legally identified with T/P Funding Services Inc. or any other named defendant. The contest appears to be solely over whether or not PaineWebber aided and abetted T/P Funding Services Inc. when it transferred the funds being held by Banc Caribe in the PaineWebber account. Although there is much conflicting testimony on this point, it is clear to us that PaineWebber did just that. We know from pages 27-51 and 27-52 of Exhibit 27 and Bonaventure's testimony that PaineWebber did receive a request to trace the $2 million fund and did identify the account in which it was being held. These exhibits, mysteriously lost by PaineWebber until the eve of the hearing, establish that the account was found and identified by PaineWebber. We know also that this information was never disclosed to the SEC until after the money was transferred out; and finally, we know from Hlavacek's testimony that PaineWebber had been informed that these funds were believed to be proceeds of the Cash 4 Titles Ponzi scheme. To hold that PaineWebber is not accountable for its actions under these circumstances would be to drastically undermine the effectiveness of freeze orders such as the one issued in this case. The purpose of such orders is to put all who might be in possession or control of assets fraudulently obtained by defendants on notice that they may not allow the transfer of such assets out of the reach of the pending court action. If PaineWebber and other financial institutions can avoid the effects of such orders simply by claiming mistake, accident, or a lack of intent, then the orders lose much of their effectiveness. A large

15

institution like PaineWebber, precisely the type of institution one might choose to bury proceeds of illegal activity, can always claim that the transfer was inadvertent - the result of a miscommunication or a lack of communication within its ranks. Such an institution can always claim inadvertence due the large number of accounts it must handle or the many employees or departments it must coordinate. Thus, to allow such circumstances to be an excuse for failure to abide by the terms of a freeze order, would be to give defendants such as those named in this lawsuit essentially a safe haven. They would merely have to deposit their fraudulently acquired funds in one of the major financial institutions and thereby assure themselves of always being one step ahead of the authorities in hiding and ultimately absconding with their illegal gains. That is precisely what happened in the case at bar. Nor does a requirement of reasonable diligence pose an undue burden on PaineWebber. As is clear from Bonaventure's testimony in this case, and from what Miron actually did, all PaineWebber needed to do initially was to run a computer search for its accounts under the name of Banc Caribe and then inform the SEC of the results. Indeed, Miron finally did just this while Hlavacek waited on the phone. Upon the receipt of the freeze order, as upon the receipt of the subpoena, if PaineWebber had simply done just this - run a computer search and then inform the SEC, the $2 million would still be within the reach of the receiver. To accomplish such a simple task would have taken PaineWebber but a few minutes, no more. At the very least, a third party with actual knowledge of the court's order is required to use reasonable diligence to make sure that it does not violate that order. This, PaineWebber failed to do. After carefully considering the testimony of the various witnesses, it is clear that the only reasonable inference to be drawn from the record is that early on, someone at PaineWebber, most probably Ms. Bonaventure - in spite of her lack of recollection of any such request, was asked to identify the Banc Caribe account in which the $2 million was being held - and did so. It is also clear that Paine Webber failed to notify the SEC, and

upon receiving the freeze order either failed to identify this account as an account frozen by the order, or proceeded in spite of such knowledge. PaineWebber had ample information, transmitted to it by the government's prior efforts to trace the funds, the statements of Hlavack and the language of the order itself, from which it could determine that the funds contained in this account were likely proceeds targeted by the court's order. Its transfer of the funds on the direction of Banc Caribe is a clear violation of the court's order. Any reasonable person, given these circumstances, would have refused to transfer the funds at least until it could obtain a determination from the SEC or the court or until the parties could do so. That is what was required of PaineWebber in this case. Instead, PaineWebber either transferred the funds knowing full well that they were likely the target of the court's freeze order, or because of extreme negligence never even bothered to make an initial determination as to whether or not the funds were frozen by the court's order.[4] We need not determine which of these two possibilities actually occurred as either one would put PaineWebber in civil contempt.

PaineWebber has pointed out deficiencies and weaknesses in Hlavacek's testimony. It is true that many of Hlavacek's answers lack specificity or are couched in terms of probability rather than certainty. For example, at one point the receiver's counsel asks: "Can you state whether or not you would have linked this $2 million to the investigation you were undertaking?" Hlavacek answers: "I would have said that we were -- as part of our investigation we were interested in determining what

---

[4] Apparently this lack of diligence is not an isolated circumstance. As pointed out in "Receiver's Post-Hearing Memorandum Regarding Motion to Show Cause against UBS PaineWebber", after receiving Hlavacek's letter complaining of the loss of the $2 million PaineWebber received from "Caribe Securities & Trust Co. Ltd." over $3 million in deposits. This company, which has the same address as Banc Caribe was likely known to PaineWebber to be associated with Banc Caribe and/or C4T, as its account statements were kept by PaineWebber in a file named "Homa". PaineWebber never bothered, even then after the subpoena, the freeze order, and Hlavacek's "complaint" letter, to notify the receiver or the SEC of these funds which had come back into its control and could conceivably be subject to the terms of the freeze order.

17

happened to these funds." (Hearing at 14.) This answer, like many others, fails to state in definite concrete terms what he did actually say to Bonaventure. Further, Hlavacek kept very little documentation of the content of his conversations with Bonaventure.

However, even with the deficiencies in Hlavacek's testimony, by the time the freeze order issued, PaineWebber had plenty of notice that Hlavacek, acting on behalf of the SEC, believed the $2 million in the PaineWebber Banc Caribe account was subject to the freeze order. The facsimile cover sheet sent on October15, 1999 by Hlavacek to Bonaventure with a copy of the freeze order entered the same day contained the following message: "Asset freeze on the accounts of Banc Caribe Limited." (Ex. H.) In addition, there would be no other logical reason for him to serve the freeze order on PaineWebber while simultaneously inquiring as to the whereabouts of the $2 million. This conclusion becomes even more obvious when we consider that PaineWebber had already received a subpoena naming as targets three of the named defendants in the freeze order caption, as well as three other entities also specifically named in the freeze order as possibly having accounts in the name of or for the beneficial interest of the named defendants. In spite of what she testified, we are convinced Bonaventure was aware that Hlavacek had consistently inquired into the whereabouts of this $2 million deposit in the account of Banc Caribe in the context of his investigation subpoena, a subpoena that PaineWebber knew was linked to the freeze order that ultimately issued. At this point, any attempt to transfer the $2 million in the Banc Caribe account should have sent off alarm bells throughout PaineWebber. Obviously, that did not happen. PaineWebber not only failed to take reasonable steps and use reasonable diligence in complying with the court's order, it appears to have made no effort at all to do so - or, at best, a truncated effort that ceased when it discovered the existence of the $2 million Bank Caribe account under a slightly different account number.

18

There remains only to determine the appropriate civil sanction. In this case that determination was addressed by the receiver's witness, Mitchell James Hall. Mr. Hall is both a licensed attorney and a certified public accountant in the state of Michigan. He testified that he prepared an interest calculation on $1.975 million. In doing so he calculated the average daily interest rate on an account in which other escrow funds relating to Bank Carib were kept. His calculation is depicted in the Receiver's Exhibit T. This exhibit shows an estimated lost interest earnings on the sum of $1,975,000 from November 1, 1999 through September 22, 2003 of $272,400.86. When added to the principal of $1,975,000 the total is $2,247,400.86.

## CONCLUSION

For the foregoing reasons the receiver's petition to find PaineWebber in civil contempt is GRANTED. In order to purge itself of its's contempt, PaineWebber is ordered to pay to the receiver the sum of $2,247,400.86 representing the principal sum of $1,975,000 transferred in violation of the court's freeze order, and $272,400.86 in lost interest from the date of November 1, 1999. Said funds to be held by the receiver along with other assets recovered from the Cash 4 Titles defendants for the purpose of distribution to defrauded investors.

SO ORDERED

ENTER: 5/12/04

_____
RONALD A. GUZMÁN
District Judge

19