# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6895 | **DATE** | 6/25/2004 |
| **CASE TITLE** | SECURITIES & EXCHANGE COMMISSION vs. CHARLES RICHARD HOMA, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER regarding disgorgement, prejudgment interest, and civil penalties against Jimmy B. Roof; Jimmy B. Roof, LLC; R & E Associates LTD. D/B/A Roof & Ellenburg, LLC; J. Roof and R. Ellenburg, LLC; R & E LTD. D/B/A JB Roof & Associates, Inc.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | JUN 28 2004 | |
| ✓ | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 1390 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| CG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JUN 2 8 2004

SECURITIES AND EXCHANGE )
COMMISSION, )
 )
      Plaintiff, ) 99 C 6895
 )
v. ) Judge Ronald A. Guzmán
 )
 )
CHARLES RICHARD HOMA, et al., )
 )
      Defendants. )

## MEMORANDUM OPINION AND ORDER

The government seeks disgorgement and prejudgment interest against Jimmy B. Roof ("Roof"); Jimmy B. Roof, LLC ("JBR-LLC"); R & E Associates Ltd. d/b/a Roof & Ellenburg, LLC ("RE #1"); J. Roof and R. Ellenburg, LLC ("RE #2"); R & E Ltd. d/b/a JB Roof & Associates, LLC ("JB Roof") (collectively "the Roof Defendants") and the imposition of third-tier civil penalties against Roof, JBR and RE #1 for their part in the multi-million dollar Cash 4 Titles fraud. The Roof Defendants previously agreed to pay disgorgement and prejudgment interest, leaving only the amounts at issue before the court at this time. (Permanent Injunction Orders of 6/22/00.) The SEC need only show that the amount of disgorgement is a reasonable approximation of the profits causally connected to the violation. After that, the burden shifts to the Roof Defendants to prove the approximation is inaccurate. When a defendant

1

impedes determination of specific unlawful gains, then it is within the court's power to rule that the measure of disgorgement will be the more readily measurable amount of losses incurred by the defendant's customers in the unlawful transactions. The government witnesses, Scott James Hlavacek, Assistant Regional Director for the Securities and Exchange Commission in Chicago, and Phillip S. Stenger, the appointed receiver of the Roof Defendants' assets as well as other persons and entities involved in this civil proceeding, established that Roof and Ellenburg working together collected approximately $33,978,629.51 from investors for the Cash 4 Titles scheme between 1996 and October 1999.

Joint and several liability for disgorgement is proper when two or more persons cooperate with and aid each other in the commission of illegal conduct. When such cooperation is established the Court can hold all such tortfeasors jointly and severally liable for the entire amount of damages caused by all unless liability can be reasonably apportioned. The burden is on the tortfeasor to establish that the liability is capable of apportionment. *United States v. Acan Aluminum Corp.*, 964 F.2d 252, 269 (3rd Cir. 1992). The usual factors to be considered by the court in making a determination of joint and several liability include: (1) the existence of unnecessarily complex transactions; (2) movement of funds through various accounts; (3) using nominees to hold securities or profits; and (4) intentionally failing to keep accurate records.

In that regard, there is the testimony of Mr. Hlavacek and Mr. Stenger who testified that during some of the investigation in this case Mr. Roof and Mr. Ellenburg were represented by the

same attorney who did not differentiate in any way in the production of documents between the documents of Mr. Roof and Mr. Ellenburg. Mr. Hlavacek also testified from plaintiff's Exhibit I that the entity known as R & E Associates, Ltd. d/b/a Roof and Ellenburg, LLC was created by Mr. Roof and Mr. Ellenburg for the purpose of soliciting funds for the Cash 4 Titles business. In general, Mr. Roof would raise money for one of the various entities which he had formed for this purpose. That money would be pooled in one of the entities that was entitled Roof and Ellenburg and the money so pooled would then be sent to an offshore account in the Cayman Islands, either directly to one of Michael E. Gause's companies or to the Jibo account of which both Roof and Ellenburg were beneficial owners. Mr. Hlavacek's testimony was that the SEC has been unable to determine the specific amount of investor funds Mr. Roof personally or through his entities kept as compensation because there were a large number of transactions out of the Jibo account to different entities and the SEC was unable to identify who were the beneficial owners of these entities. During the investigation Mr. Roof lied to the SEC in material respects. When asked about the Jibo account he responded that he had no affiliation whatsoever with that account. Later, during his deposition in this litigation he refused to answer questions about the account on the grounds that to do so might tend to incriminate him.

Plaintiff's Exhibits J, K, L and M are lists of investors produced by counsel for Roof and Ellenburg in response to a subpoena issued by the SEC during its investigation of Cash 4 Titles. It contains a list of investors without differentiation between Ellenburg's investors and Roof's investors. The total shown on the those documents is $24,475,000. This amount is slightly more

than the $22,015,185.64 calculated by the receiver. Pre-judgment interest on the amount raised is $8,204,043.01. The pre-judgment interest based on the net investor losses is $5,315,503.65.

The Roof Defendants have presented the records of their accountant, Ms. Diane Odom, and bookkeeper Ms. Deborah Summers, as proof of which investors Roof solicited and, therefore, should be held responsible for. Unfortunately, the evidence shows that his records are, to say the least, incomplete. The Roof Defendants' main witness, Odom, lacks knowledge as to all of his transactions. For example, she can give no basis or reason for the creation of anywhere between seven and twelve separate corporate and legal entities each of which, apparently, was created for the sole purpose of gathering investor funds. Indeed, she claimed to be surprised on the witness stand by the very existence of one such legal entity, Rocco Associates, which, as it turns out, she was responsible for incorporating and of which she was the president, treasurer and secretary and as to which she certified that she was the duly elected qualified secretary and keeper of the records. The stock of Rocco Associates, Inc. is owned by her employer, Jimmy Roof. This impeachment alone is sufficient to damage her credibility severely. The Court finds her testimony in this regard rather difficult to believe - unless, of course, she was an accountant in name only and had no real knowledge of Roof's actual holdings, assets and income. But even this would not explain her denial of any knowledge of the existence of a corporation which she created and of which she herself was president, treasurer and secretary and as to which she certified that she was the duly elected qualified secretary and keeper of the records in November 1998. As a marketer of the fraudulent Cash 4 Titles securities herself, Odom has a personal

4

interest in the outcome of this litigation. In addition, Odom claimed Roof had no ownership interest in J & R Financial Services, Ltd. Yet that entity's 1998 tax records and other corporate documents signed and prepared by Odom show that Roof is in fact a part owner of J & R Financial Services, Ltd. Furthermore, it is clear that the bookkeeping and records were kept without adherence to the formalities required between separate and distinct legal entities. Thus, money was being passed from one organization to the other, without a clear record of such and without any known legitimate business reason. Moreover, the records presented by the Roof Defendants failed to track clearly and accurately the flow of investor funds, as opposed to the reported income of any one of the defendants. The SEC has been unable to account for the whereabouts of some approximately $4.5 million transferred out of the Jibo account in the Cayman Islands to numerous accounts in the Turks and Caicos Islands for which the SEC has no information whatsoever. In fact, Ms. Odom personally went to the Cayman Islands to inform the banking authorities that Roof and Ellenburg were in the "process of restructuring the Jibo relationship." Why Ms. Odom, the Roof Defendants' accountant, would have anything to do with restructuring the Jibo relationship if Mr. Roof had no beneficial interest, ownership or control of such account the Court cannot imagine.

Furthermore Ms. Odom was clearly unaware of the defendants' control/ownership interest in several entities including two offshore accounts through which investor funds were processed. At least one of these crucial accounts was jointly established by both defendants Roof and Ellenburg. None of the witnesses presented by the Roof Defendants were able to clarify the

relationship between Roof and Ellenburg with respect to these accounts. Further evidence of a joint enterprise is found in the fact that Ellenburg's name appears along with defendant Roof on at least five of the entities created by defendant to conduct Cash4Titles business; to wit, "R&E Ltd. d/b/a JB Roof and Associated, LLC," "Roof and Ellenburg, LLC," "Roof and Ellenburg Corp., LLC," "R & E Associates, Ltd. d/b/a Roof and Ellenburg Associates LLC," and "J Roof and R Ellenburg, LLC." No one was able to explain why this is so if their operations were indeed separate and apart. Nor was Ms. Odom able to give any possible purpose for pooling the funds collected by each into a single account if their operations were separate and independent. Finally, Ms. Odom testified that Mr. Roof did share commissions with Mr. Ellenburg on a regular basis. Sharing control of investor funds as well as commissions and proclaiming their joint enterprise in the various company names are all strong indicators that Roof and Ellenburg were acting in concert and not separate and apart in executing the Cash 4 Titles Ponzi scheme. Clearly Mr. Roof would be in a position to shed light on all of these circumstances tending to show that he and Mr. Ellenburg were engaged in a joint enterprise, but he chose not to do so. Roof asserted his Fifth Amendment privilege against self-incrimination in response to sixteen specific questions touching upon his own involvement in offshore transactions and the scheme in general. From his assertion of his Fifth Amendment right against self incrimination, the Court can and, under the circumstances, does draw the inference that Roof's testimony would have been detrimental to his interest in mitigating damages. *Baxter v. Palmigiano*, 425 U.S. 308, 318-19 (1976); *Admiral Ins. Co. v. Fed'l Sec., Inc.*, No. 94 C 5649, 1997 WL 695727, at *3 (N.D. Ill. Nov. 4, 1997).

The evidence fails to establish precisely how the defendant was being compensated for his fund-raising efforts. The Court knows from the testimony of his accountant, Ms. Odom, that he shared some of his commissions with Ellenburg. The evidence also establishes that both Roof and Ellenburg were considered to be fund coordinators by Gause, who along with Homa was in charge of the entire operation. That they shared control of the funds collected the Court knows, but the exact nature of the sharing is not clear because none of the witnesses had first-hand knowledge of the various agreements. To the extent that the parties were sharing commissions, they were working jointly and should share responsibility for each other's actions. To the extent that the Court is unable to trace accurately the flow of funds and therefore cannot determine if any of the commissions paid to Roof and Ellenburg were determined solely on the investments solicited by each or on the aggregate of the investments solicited by both together, the Court lays this inability at the defendants' feet. Certainly the fact that their funds were pooled together and that they jointly owned and controlled entities that received funds from both would tend to indicate that they were being paid on the basis of their joint efforts, otherwise why bother to pool or aggregate the investments solicited by each into a single account or entity? Such a process would make keeping separate track of each individual's performance that much more difficult, if not impossible.

Having determined to aggregate the harm caused by investors solicited by both Roof and Ellenburg, the Court turns to the issue of what is the best measure of the losses suffered by the investors. Although Roof claims to have received only $932,896.19, the Commission established

7

that this number excluded millions of dollars in unexplained activity in the Roof Defendants' and other entities' accounts. It also excluded assets and funds Roof used through the Roof entities for his own and his family members' benefit. Defendant Roof presents his income tax returns and his books and records as testified to by his accountant and his bookkeeper. As described above, however, it is clear to the Court that neither of these witnesses was fully aware of the complete nature and scope of the Cash 4 Titles investment scheme in which the Roof Defendants were involved. Even as to those areas of which they had knowledge, their testimony was inaccurate and incomplete. As pointed out above, Ms. Odom cannot tell the Court the reason for the existence of many of the thirteen different entities with which the defendant was involved. She could neither identify legitimate business reasons for these entities, nor explain why it was necessary to collect investor funds through so many different corporations and accounts. Odom admitted that all of the purported "income" reported to the entities was interest and commissions from the sale of the securities in the fraudulent scheme. She also was unaware, or claims to be unaware, of the defendant's interest in and control of some crucial offshore accounts. Nor, apparently, did she have access to the crucial information concerning the flow of the funds collected from investors. Her summary inaccurately represented certain transactions. In 1998, Roof and Ellenburg Associates, LLC, spent $2.86 million in investor funds on unidentified uses that did not include the Cash 4 Titles scheme. Odom had no idea whether Roof received any of this $2.86 million. Roof didn't explain these transactions because he refused to answer any questions at trial. As Mr. Stenger testified, the Court does not have all of the personal bank records of Roof and Ellenburg or of their various entities. Investigators have been able to

determine that the money raised from investors by Roof went into the offshore Jibo account from which it went into the offshore accounts of Gause and Homa, then back to the Jibo account and back to investors in the form of interest payments. Ms. Odom admitted an inability to determine the ultimate disposition of substantial amounts of funds flowing through the Roof and Ellenburg entities. She seemed confused about the existence of, creation of, and the relationship between the Rocco entities - one of which, as pointed out above, she herself was the president, treasurer, and secretary. Her testimony was inadequate to explain the flow of investor funds and the total benefits Roof received from these investments.

On the other hand, plaintiff presented the testimony of Philip Stenger, the receiver appointed by the court to marshal the assets of the Cash 4 Titles entities and to use the same to return to investors, to the extent possible, the money they lost in their Cash 4 Titles investments. Simply put, Mr. Stenger's information came from the investors themselves in the form of investor response forms which he collected under penalty of perjury and then verified in various systematic ways. This information was compared to, verified by, and supplemented by the investor claims forms and materials obtained as part of the $56 million class-action settlement obtained against the Bank of Bermuda by Cash 4 Titles investors; investors' own cancelled checks, bank account disbursements and deposits and even investor income tax returns. The Court finds the process was thorough and the results reliable.

The court orders Jimmy B. Roof ("Roof"); Jimmy B. Roof, LLC ("JBR-LLC"); R & E

Associates Ltd. d/b/a Roof and Ellenburg, LLC ("RE # 1"); J. Roof and R Ellenburg, LLC ("RE # 2"); and R & E Ltd. d/b/a JB Roof and Associates, LLC ("JB Roof") to pay disgorgement and pre-judgment interest calculated as follows. The total amount of funds they raised from investors is $33,978,629.51. This amount minus return paid to investors ($11,963,443.87) equals the amount to be paid in disgorgement, to wit, $22,015,185.64 in net investor losses. The court concurs in the Commission's calculated prejudgment interest amount of $5,315,503.65 based on the verified Net Investor Losses.

The government seeks third-tier penalties. Such penalties are allowed when conduct consisting of fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement and directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons. The purpose is punishment and deterrence. 15 U.S.C. § 77t(d)(2)(C)(i) and 15 U.S.C. § 78u(d)(3)(B))(iii)(I) set third-tier penalties at $110,000 for a natural person and $550,000 for any other person per violation. The SEC seeks $110,000 against Roof and $550,000 against JBR-LLC and RE #1 each. The conduct by each of these defendants clearly constituted fraud, deceit and manipulation and resulted directly in huge losses to hundreds of investors. There is a need here for both punishment and deterrence. These defendants' actions were deliberately deceitful and manipulative and knowingly illegal. Third-tier penalties

are imposed in the amounts of $110,000 against Roof and $550,000 against JBR-LLC and RE #1 each.

**SO ORDERED**  ENTER: 6/25/04

HON. RONALD A. GUZMAN
**United States Judge**