IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br>v.<br><br>CHARLES RICHARD HOMA; SUNSET FINANCIAL SERVICES, LLC, C4T MANAGEMENT, INC., T/P FUNDING SERVICES, INC., MICHAEL GAUSE, BILL J. SHORT, II, JIMMY B. ROOF, ROBERT C. ELLENBURG, STEVEN SHANE NICHOLS, CHARLES EDWARD DICKERSON, PHILIP A. SHARPTON, BILCIN ENTERPRISES, INC., JIMMY B. ROOF, LLC, R. ELLENBURG, LLC, R & E ASSOCIATES LTD. D/B/A/ ROOF & ELLENBURG, LLC, SAFEHARBOR ADVISORS, INC., PAS, INC., PAS HOLDINGS, INC., VOLUNTEER ENTERPRISES, LTD., GULFCOAST HOLDINGS, LLC, R & E LTD. D/B/A/ JB ROOF & ASSOCIATES, LLC, J & R FINANCIAL SERVICES, LTD., J. ROOF & R ELLENBURG, LLC, BELLWETHER HOLDINGS, LLC, SOUTHWESTERN HOLDINGS, LLC, TITLE HOLDINGS, LLC, D. DEAN PEARSON, JOHN TELFORD SNIPES, JOHN MARTIN CAELSON, JOSEPH FREDERICK DENSON, JR., CARLSON NATIONAL BROKERS, LTD., GLOBAL MANAGEMENT ENTERPRISES, LLC, PREFERRED RETURNS, INC., JTP, INC., TRADEWINDS HOLDINGS, LLC, PEAK HOLDINGS, LLC, HARBOR HOLDINGS, LLC, PEARSON ENTERPRISES TRUST, PARAMOUNT HOLDINGS, LLC, PREMIERE HOLDINGS, LTD., ROLLS ROYCE, LTD., and MORNINGSTAR, LTD.<br><br>Defendants,<br>and<br><br>LINDY L. GAUSE, LINDA L. NICHOLS AND NICHOLS AND ASSOCIATES,<br><br>Relief Defendants. | No. 99 C 6895<br><br>Judge Ronald A. Guzmán |

## MEMORANDUM OPINION AND ORDER

David Allan Pollock has been held in contempt of court for violating the Court's freeze orders as to funds raised in the largest Ponzi scheme in U.S. history and was ordered to disgorge $7.2 million.[1] Pollock has fled the country. The Receiver, after recently discovering that Pollock is an equity owner of a U.S. corporation with substantial assets named Caribbean Ventures International, Inc. ("CVII"), successfully moved for a temporary restraining order to temporarily freeze respondent CVII's assets, appoint it as temporary Receiver of CVII's assets and order Caribbean Ventures International, Inc. to show cause why a preliminary injunction should not be granted. CVII has moved to dismiss the Receiver's action against it for lack of personal jurisdiction and for lack of venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3). For the following reasons, the Court denies CVII's emergency motion to dismiss.

## Discussion

CVII argues that this Court lacks personal jurisdiction over it because: (1) Federal Rule of Civil Procedure ("Rule") 4(k)(1)(D), which provides for nationwide service of process, is inapplicable because CVII is a nonparty; and (2) CVII does not have sufficient minimum contacts with the United States or the State of Illinois. In response, the Receiver argues: (1) CVII has

[1]On September 7, 2006, this Court entered an injunctive order which restrains and enjoins Pollock and Jones, their attorneys and agents, and anyone acting in concert with them or on their behalf who has notice directly or indirectly of the order from transferring, encumbering, alienating, selling, gifting, or otherwise dissipating any of their assets or the assets of any company, corporation, trust or other entity under their control or partial control, whether directly or indirectly, including but not limited to Morgan Global Capital and Caribbean Ventures, until further order of this Court.

waived its objection to personal jurisdiction; (2) Rule 4(k)(1)(D) applies and thus service of process is proper; and (3) CVII has established sufficient minimum contacts with the United States.

The Court first must determine whether CVII has waived its objection to personal jurisdiction. *See* Fed. R. Civ. P. 12(h) (stating that objection for lack of personal jurisdiction may be waived). "If a party enters a case, makes no objection to jurisdiction, and asks the court to act on its behalf in some substantive way, it will be held to have waived further objection." *Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972). For example, such a waiver occurs where a defendant "makes an appearance-either by appearing in court or filing a motion-without reserving an objection to jurisdiction." *Bhagwati Corp. v. City of Waukegan*, No. 04-5478, 2005 WL 526786, at *2 (N.D. Ill. Mar. 1, 2005).

CVII appeared before this Court twice without asserting its challenge to personal jurisdiction. Further, CVII moved for a protective order asking the Court to act on its behalf. Most importantly, CVII and the Receiver presented an agreed order extending the temporary restraining order to the date of the hearing on the rule to show cause, which again asked the Court to act on its behalf in some substantive way. (Agreed Order of 10/30/06.) Further, CVII has propounded discovery as to facts going to the merits of the action as opposed to discovery regarding personal jurisdiction. (Receiver's Resp. CVII's Mot. Dismiss Lack Personal Jurisdiction, Ex. 2, CVII's Interrog. Receiver Phillip S. Stenger Regarding Mot. Prelim. Inj.; *id.*, Ex. 3, CVII's First Req. Prod. Docs. Receiver Phillip S. Stenger Regarding Mot. Prelim. Inj.) Because CVII has repeatedly made appearances before the Court and asked it to act substantively on its behalf prior to ever having objected to personal jurisdiction, the Court deems CVII's

objection waived.

Even if CVII had not waived its objection to personal jurisdiction, the Court would still deny CVII's motion to dismiss because the Court has jurisdiction over David Pollock, CVII's alter ego, and CVII itself has sufficient minimum contacts with the United States for the Court to assert personal jurisdiction over it.

First, the Court may appropriately treat CVII as Pollock himself because, as discussed below, (1) there is no corporate documentation to show that CVII has any shareholders other than David Pollock; and (2) the evidence shows that David Pollock's control and dominion over the corporation is such that there is no distinction between the two, and adhering to the corporate fiction would "cause fraud or similar injustice," *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (quotation and alterations omitted).

1. Kelly Pollock, David's wife, maintains that she purchased a majority share of CVII stock. However, the photocopy of the check she produces as proof of such a purchase is payable to Caribbean Ventures International, not CVII. The check was deposited in the account of Caribbean Ventures International Ltd., a corporation which respondent in its argument before the court, insists is totally separate and distinct entity from CVII. In fact, respondent has argued that it is Caribbean Ventures International Ltd. that is the subject of the court's prior findings and should be the actual target of the Receiver's attempts to execute the court's disgorgement order against Pollock. Further, the check was never endorsed by CVII, or even Caribbean Ventures International, but rather, by Banc Caribe.

Banc Caribe, this Court has already determined, was owned and operated by David Pollock, Jones and Homa and used by them as a means of diverting and laundering the proceeds of the Cash 4 Titles fraudulent scheme. In addition, CVII has no evidence that it ever received any funds from Ms. Pollock. CVII says there are no documents because it has never had a bank account. But there must be some documentation somewhere to show that Ms. Pollock's alleged payment of $100,000.00 for 1000 shares (quite some bargain given, as discussed below, Mr. Pollock's payment of $45 million for half that amount of shares) somehow inured to the benefit of CVII. The money could not simply have disappeared into thin air. The corporation must have utilized it somehow and accounted for the receipt and expenditure. Yet CVII is apparently incapable of producing any such evidence. This the Court finds hard to believe.

2. In addition, the photocopies of stock certificates which Ms. Pollock submits as proof of her purchase/ownership of CVII stock are actually stock certificates for Caribbean Ventures International Ltd., not CVII.[2] Further, the corporate records that CVII has submitted in support of Ms. Pollock's affidavit and its motion to dismiss do not reflect a stock purchase by Ms. Pollock. The minutes of the 2000 board of director's meeting

---

[2] Respondent argues that this is a "clerical mistake" in the drafting of the certificate, and that proof of this lies in the fact that the certificate states that Caribbean Ventures International, Ltd. was incorporated under the laws of Delaware, when in fact it is a foreign corporation. But respondent offers no explanation as to how such a drastic "mistake" could have occurred. To accept such an explanation without any proof, would require us to ignore the plain language on the face of the stock certificate. At the very least, the respondent's explanation of clerical error regarding a document so critical to its position casts great doubt upon the authenticity, veracity and reliability of the documentary evidence it has presented in support of its motion.

show that on June 19, 2000 David Pollock offered to purchase 500 shares of the corporation for the "sum of $90,000.00 dollars in cash for each such share," an offer that CVII accepted. According to this resolution, Pollock invested $45 million in CVII, which was designated as corporate capital. As to any purchase of shares by Ms. Pollock, however, the corporate records are silent. There is no resolution at any meeting of the board of directors accepting an offer to purchase by or authorizing the issuance or delivery of any shares of CVII stock to Ms. Pollock. Nor is there any documentation that CVII received any money or other consideration for the sale of any such stock. Respondent has also failed to produce any evidence that Ms. Pollock is the registered owner of any such stock. This is in sharp contrast to the documentation, as informal and sloppy as it is,[3] of the purchase of and payment for shares of stock in CVII by David Pollock.

3. In her affidavit, Ms. Pollock asserts that the funds she used to make the alleged stock purchase came from her own personal accounts and are totally separate from those of David Pollock. However, she did not submit documentary evidence of the existence of such accounts, the balance of the accounts before and after the alleged stock purchase or any documents reflecting the transfer of her funds to CVII. It would have been a simple matter to obtain the records which reflect her ownership of the particular bank account from which the funds came and the records evidencing the transfer of funds from that

[3]The minutes of the CVII's board of directors meetings submitted by respondent are preprinted forms with various blanks inconsistently filled in with block letters by hand.

account, in whatever form, to CVII. Further, the Pollocks refuse to present themselves to answer questions regarding these material inadequacies and contradictions in and between CVII's documents and their representations.

4. CVII's corporate records also fail to support its assertion that Ms. Pollock is a director of the company. The first mention of Ms. Pollock in any of the corporate documents occurs in the minutes of the January 4, 2004 regular board of directors meeting. Those minutes state: "The following directors were present and constituted a quorum: David Pollock, Kelly Pollock[.]" All of the other corporate documents prior to this date list David Pollock as the sole director and shareholder. The January 4, 2004 minutes also say Kelly Pollock was nominated and elected as vice president. But none of the prior, subsequent or contemporaneous corporate documents indicate that Kelly Pollock was ever elected to the board of directors. One does not become a director of the board of a corporation without an election or resolution or some other legal act effectuating the appointment. *See Bentas v. Haseotes*, 769 A.2d 70, 76 (Del. Ch. 2000) ("[T]he business and affairs of a Delaware corporation must be governed by a board of directors whose members have stood for election, and who have actually been elected by the stockholders, on an annual basis.")[4] The fact that Ms. Pollack's name is written in the space provided for the

---

[4]*See* Del. Code Ann. tit. 8, § 211(b) (2006) ("Unless directors are elected by written consent in lieu of an annual meeting as permitted by this subsection, an annual meeting of stockholders shall be held for the election of directors on a date and at a time designated by or in the manner provided in the bylaws. Stockholders may, unless the certificate of incorporation otherwise provides, act by written consent to elect directors; provided, however, that, if such

directors' names on a preprinted corporate minutes form does not make her director of CVII. No such election of directors electing Kelly Pollock to the board was held at the annual shareholders meeting on January 4, 2004 or at any other meeting before or after. Nor has any proof, oral or documentary, been submitted to establish written consent in lieu of an election at the annual meeting for the election of Ms. Pollock to the board. Thus, there is no documentary corroboration of Ms. Pollock's assertion that she is a director of CVII. More importantly, the same is true of her assertion that she is the majority shareholder of CVII. The evidence CVII has presented establishes the opposite. Thus, contrary to her assertions otherwise, Ms. Pollock is not able to remove David Pollock from his position as president, treasurer or sole director of CVII. As the sole shareholder, David Pollock exerts total control over the affairs of CVII and enjoys the sole and total benefit of all corporate assets.

5. The Court also takes judicial notice of its findings as enumerated in the Court's bench opinion of August 3, 2006. In that opinion, the Court found that Mr. Pollock intentionally violated the Court's order against transferring funds for the express purpose of putting the funds outside of the Court's reach in foreign depositories. The Court also found David Pollock's testimony at the contempt proceedings to lack credibility. In

---

consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action. Any other proper business may be transacted at the annual meeting.")

addition, the Court found that both David Pollock and Paul Jones are well versed in use of corporations and sham documents to launder proceeds, hide the true nature of transactions and true ownership of assets, and that they have on prior occasions related to this litigation engaged in such actions. Mr. Pollock has now fled the country in an attempt to avoid disgorgement as required by the order that holds him in contempt of court. Mr. Pollock cannot use the corporate form to evade this Court's order of disgorgement and other injunctive relief that binds him.

6. Because the Court deems CVII the alter ego of Mr. Pollock and Mr. Pollock participated in this litigation for three years before he fled to St. Lucia without objecting to venue, the Court deems CVII's venue objection to be waived. *See* Fed. R. Civ. P. 12(h)(1).

Even if Mr. Pollock were not CVII's sole shareholder and alter ego, the Court would still deny CVII's motion to dismiss. CVII argues that because it is not a party to the underlying case, Rule 4(k)(1)(D) does not apply, and thus the Court lacks personal jurisdiction over it. However, whether CVII is a party to the underlying suit is not dispositive of the issue. This Court has the inherent power to enforce compliance with its lawful orders and to bring before it all parties necessary to do so. *Shillitani v. United States*, 34 U.S. 364, 370 (1996); *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. (1993); *Fitzsimmons v. Barton*, 589 F.2d 330, 332 (7th Cir. 1979). Moreover, the Seventh Circuit has said:

> [U]nder certain circumstances Rules 70 and 71 of the Federal Rules of Civil Procedure permit a district court to find a nonparty in contempt. Rule 70 permits a court to find a *party* in contempt if

> he fails to honor a court's order. Rule 71 provides that "when obedience to an order may be lawfully enforced against a person who is not a party, that person is liable to the same process for enforcing obedience to the order as if a party." However, Rule 71 does not define the circumstances under which an order "may be lawfully enforced," instead leaving that issue to the enforcing court. 12 *C. Wright & A. Miller, Federal Practice and Procedure* § 3031 (1973). We also agree . . . that ordinarily a court may find a nonparty in contempt if that person has actual knowledge of the court order and either abets the party named in the court order or is legally identified with him.

*Stotler & Co. v. Able*, 870 F.2d 1158, 1164 (7th Cir. 1989) (quotation and alteration omitted).

By virtue of this authority, this Court has previously found David Pollock, a non-party, to be in contempt of court in part for violating the Court's freeze order. Like Pollock's, CVII's presence before this Court is clearly necessary to give effect to the judgment of contempt and disgorgement against David Pollock because he is an equity owner of CVII and the company owns or possesses some of his assets. Moreover, CVII has actual knowledge of the Court's order both because David Pollock, its president, sole board member and shareholder, had notice of it and the order was served on its registered agent.

Because, under Rule 71, a non-party may, under appropriate circumstances be liable to the same process for enforcing obedience to an order of the Court as a party, we must look to the rules specifying the appropriate service for parties to determine the proper process for respondent. Rule 4(k) sets the territorial limits within which service of process will be effective to secure personal jurisdiction upon a party. Fed. R. Civ. P. 4(k).

Rule 4(k)(1)(A) describes the territorial limits by reference to the rules of the state in which the district court is located. Fed. R. Civ. P. 4(k)(1)(A). It is this rule upon which defendants rely when they complain that they have had virtually no contacts with Illinois or the

Northern District of Illinois. However, Rule 4(k)(1)(D) expressly states that service is also effective to obtain personal jurisdiction when authorized by U.S. statute. The federal statutes at issue here, 15 U.S.C. §§ 77v(a), 78aa, authorize service wherever a defendant may be found, *e.g.*, nationwide service of process. 15 U.S.C. §§ 77v(a), 78aa; *see Fitzsimmons*, 589 F.2d at 332; *see also Sec. Investors Protection Corp. v. Vigman,* 764 F.2d 1309, 1314-15 (9th Cir. 1985). Thus, "the only question before us is whether the Due Process Clause imposes any restraints on this nationwide service." *Fitzsimmons*, 589 F.2d at 332.

According to the *Fitzsimmons* court, the answer is "no." *Id.* "There is . . . nothing in the Constitution which forbids Congress to enact that, as to a class of cases or a case of special character, a . . . court in which the suit may be brought, shall, by process served anywhere in the United States, have the power to bring before it all the parties necessary to its decision." *Id.* at 333 (quotation omitted).[5]

In the case at bar, as illustrated by the following, it is clear that CVII has more than sufficient contacts with the United States to establish personal jurisdiction over it.

1. CVII is a corporation, incorporated under the laws of the State of Delaware.

2. CVII's incorporator and registered agent for service of process is in Delaware.

---

[5]*See also S.E.C. v. Unifund SAL,* 910 F.2d 1028, 1033 (2d Cir. 1990) ("Since the Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment, *see Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 998 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L. Ed. 2d 389 (1975); *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1339 (2d Cir. 1972), the personal jurisdiction challenge raised by Unifund must be tested against due process standards.")

3. By incorporating in the state of Delaware, CVII has submitted to the jurisdiction of that state's courts. *See* 8 Del. Code § 169 ("[F]or all purposes of title, action, attachment, garnishment and jurisdiction of all courts held in this state, . . . the situs of the ownership of the capital stock of all corporations existing under the laws of this State, whether organized under this chapter or otherwise, shall be regarded as in this state.")

4. "[A] corporation . . . is exclusively regarded as a citizen, resident or inhabitant of the state or country under the laws of which it was created, even though it may be engaged in business and have an office in another country or state." 17 Fletcher Cyclodedia of Corporation § 8300. Therefore, CVII is both a citizen and resident of the United States. That fact alone gives CVII sufficient contacts with the United States to support the fairness of this Court's exercise of personal jurisdiction over it. *See Fitzsimmons*, 589 F.2d at 333.

5. In addition, by maintaining its registered agent for service of process in the United States, CVII has agreed to be served in the United States and cannot claim surprise or prejudice that the Receiver has done precisely that. Indeed, it appears that CVII is not contesting the manner of service.

6. Although Ms. Pollock, who claims to be an officer of CVII, asserts by way of affidavit that the corporation's principal place of business is in St. Lucia, the West Indies, there is

insufficient evidence in the record to establish either that Ms. Pollock has personal knowledge of the facts she claims to assert or that her assertions are accurate. As further explained below, quite the contrary is true.

7. The records submitted by CVII reflect that the corporation was organized on June 1, 2000 by incorporator James Fields who adopted the initial bylaws -- which have never been produced -- and elected David Pollock to serve as a director of the corporation until the first annual stockholders meeting and the election of successors. The "Organization Action in Writing of Incorporator," however, does not indicate where this organizational action occurred. The certificate of incorporation, however, which was executed by James Fields on June 1, 2000, indicates that the incorporator, "James Fields, The Company Corporation," is located at "1013 Center Rd." in "Wilmington, Delaware." Therefore, it would appear that the organizational action took place in the State of Delaware.

8. It is impossible to determine from the conflicting records submitted by CVII where the first organizational meeting of directors took place. The waiver of notice of organizational meeting of directors of CVII, dated June 19, 2000 and signed by David Pollock as sole director, consents to the meeting being held "at: Date: June 19, 2000; Time: 10:15 a.m. ; Place: Roseau, Dominica." However, minutes of a special meeting of the board of directors of the corporation, signed by David Pollock, show that a special meeting of the board of directors, *i.e.*, David Pollock, was held also on June 19, 2000 in Fort Lauderdale, Florida. The document entitled "Evaluating Shares" shows that David

Pollock purchased 500 shares of CVII stock on June 19, 2000, but it does not indicate at what meeting or location the resolutions involved were enacted. At any rate, the minutes of the June 19, 2000 special meeting of the board of directors show that CVII transacted its first business on that date by purchasing "from its capital resources one 1992 37' Sea Ray, Official No. 986252 vessel known as ALLIEGATOR" in Fort Lauderdale, Florida. Thus, CVII has held at least one board of directors meeting in the United States, and transacted its very first business in the United States, facts that directly contradict the assertions made by CVII in its pleadings and affidavits.

9. The only assets that all parties agree CVII owns are three vessels, Reel Time, Offshore Manor, and Thunder. These vessels are by their very nature mobile and their location at any particular point in time can hardly be controlling of the issue of minimum contacts. Much more significant to the analysis is that CVII has registered all three vessels with the U.S. Coast Guard and has affirmatively declared that their hailing port is Winter Park, Florida. Winter Park, Florida is also the town where Mr. Pollock keeps his P.O. box for business. Thus, the corporate property that is the focal point of this action and the sole assets of CVII, is registered with the U.S. Coast Guard as hailing from a U.S. port in the same city that Pollock uses as a business address. For purposes of establishing whether a lien attaches, therefore, her owners (CVII) are presumed to live in Florida.[6]

[6]*See Pittman v. The Samuel Marshall*, 54 F. 396, 399 (6th Cir. 1893) ("The vessel, as has been stated, was enrolled at Buffalo, and carried that as her hail port upon her stern. When a material or supply man furnishes supplies to a vessel without other knowledge of her, he has a right to suppose that her owners live in the state of the port where she is enrolled, and that, therefore, her home port is that which is painted on her stern . . . for the purpose of determining

10. U.S. Coast Guard records show that CVII registered the vessel "Reel Time" on April 30, 2005 and listed CVII's address, not as St. Lucia, but as 1013 Centre Road, Wilmington, DE. (Resp.'s Ex. 5.)

11. U.S. Coast Guard records show that CVII registered the vessel "Offshore Manor" on September 22, 2005 and listed CVII's address, not as St. Lucia, but as 1013 Centre Road, Wilmington, DE. (*Id.*)

12. Coast Guard records show that CVII registered the vessel "Thunder" on November 2, 2005 and listed CVII's address, not as St. Lucia, but as 1013 Centre Road, Wilmington, DE. (*Id.*)

13. Thus, on three separate occasions in 2005, CVII transacted the business of securing what its counsel describes as its sole assets, the three boats, by registering them with U.S. authorities as U.S.-based vessels and on each occasion listed its address as 1013 Center Rd, Wilmington, DE, not Rodney Bay, St. Lucia.

14. The Court has previously found in a related action that David Pollock, president, secretary, treasurer, director and shareholder of CVII is a citizen of the United States,

---

whether a lien attaches . . . .").

maintains a P.O. box in Florida and holds a Florida driver's license.

15. Kelly Pollock, who claims to be vice president, shareholder and director of CVII, has admitted through counsel that she is a citizen of the United States. Moreover, though she says she has a residence in St. Lucia, CVII's counsel was unable say whether she also maintains a residence in the United States. In support of the motion to dismiss, Kelly Pollock herself states only that she does not reside in Illinois, studiously avoiding a representation about any other U.S. residence. The photocopy of the check which respondent provided shows a home address for Ms. Pollock of "1840 Walker Ave., Winter Park, Fl. 32789."

16. Thus, CVII incorporated in the United States, is a citizen and resident of the United States, has held director's meetings in the United States, has conducted business in the United States specific to the assets the Court seeks to attach, and has declared the home port of such assets to be in Winter Park, Florida. Clearly, there are more than sufficient contacts with the United States by this American citizen to warrant the exercise of personal jurisdiction over it.

17. At the contempt proceedings, Pollock testified that the money used to purchase the home in St. Lucia comes from the proceeds at issue in the contempt proceedings. Photographs of the home and its furnishings can be found in Pollock's web site: www.ourvillacaribe.com. The web site contains photographs of three boats. One boat is

clearly identifiable as "Reel Time." The other two cannot be identified from the photographs alone. From this it appears that the corporate assets are under Mr. Pollock's personal dominion and control.

18. Mr. Pollock's long-time friend, associate and co-contemnor, Paul M. Jones, has informed the Receiver and SEC investigators that Mr. Pollock put the funds he received from the sale of Bank Caribe into CVII. He has also confirmed that David Pollock controls CVII and uses it to shelter assets.

In sum, based upon the totality of the evidence, the Court finds: (1) CVII waived its objections to personal jurisdiction and venue; (2) CVII is the alter ego of Mr. Pollock, over whom the Court has already found personal jurisdiction exists, and is merely the vehicle Mr. Pollock is using to evade the Court's judgment; (3) even if CVII were not Mr. Pollock's alter ego, the Court finds that CVII has sufficient contacts with the United States to make it amenable to the Court's jurisdiction.

Accordingly, the Court denies CVII's motions to dismiss for lack of personal jurisdiction and improper venue. [7]

**SO ORDERED.** **ENTERED:** Nov. 6, 2006

Ronald A. Guzman

**HON. RONALD A. GUZMAN**
**United States District Judge**

---

[7] CVII has submitted documents attached to its reply brief in support of its motion. When new evidence is presented in a reply brief, a district court will not consider the new evidence without giving the opponent an opportunity to respond. *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990). The district court has the discretion as to whether to consider evidence raised for the first time in a reply brief. *Id.*

The Court in its discretion declines to consider CVII's tardy submission for the following reasons. First, it is not as if the tardy evidence addresses some novel or subtle argument raised by the Receiver in its response brief. All of the evidence merely addresses arguments either contemplated or raised by CVII itself in its opening brief. Second, there is no reason why the documents could not have been provided with CVII's opening brief to explain the discrepancies that appear on the face of the documents that CVII itself provided. Third, the Court cannot consider the new evidence unless and until the Receiver has an opportunity to respond. To do so would be extremely unfair to the Receiver. In order to respond to the newly produced evidence, which includes documents that purport to be the financial statements of CVII (the preparer of which is unknown), it is clear that the Receiver will need to depose CVII's purported officers and directors, Kelly and David Pollock. On November 1, 2006, the Court denied CVII's motion for a protective order regarding the telephonic, videotaped deposition of Kelly and David Pollock. In the event that the Pollocks make themselves available for deposition in a way that comports with this Court's rulings, and thus, the Receiver has a reasonable opportunity to respond to this "evidence", the Court may consider a renewed motion to dismiss.